PUBLIC INTEREST RESEARCH
GROUP OF NEW JERSEY,
INC., et al.

v.

GAF CORPORATION.

Civ. A. No. 89–2283.

United States District Court,
D. New Jersey.

Feb. 28, 1991.

Jeffrey A. Cohen, Hannoch Weisman, Roseland, N.J., for defendant.

Edward Lloyd, Trenton, N.J., Bruce Terris, Terris Pravlik & Wagner, Washington, D.C., for plaintiffs.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

HAROLD A. ACKERMAN, District Judge.

### I. *Introduction*

On May 24, 1989, the plaintiffs, Public Interest Research Group of New Jersey, Inc. ("NJPIRG"), and Friends of the Earth, Inc. ("FOE"), filed this citizens' suit against the defendant, GAF Corporation ("GAF"), under Section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365[1] (the "Clean Water Act"). The complaint was filed subsequent to the expiration of sixty days following the issuance of the plaintiffs' notice of intent to sue GAF.[2] In the one-count complaint, the plaintiffs allege that beginning in August 1985, and running through March, 1989, GAF violated certain effluent limitations contained in the permits issued to it by the

---

1. (1988).

2. It appears that this notice was sent on or about March 21, 1989, and that an amended notice was sent on March 29, 1989 in which FOE joined. The notice was sent to the EPA and the DEP, as well as GAF.

New Jersey Department of Environmental Protection (the "DEP"), under the authority delegated to the DEP by the Administrator of the Environmental Protection Agency, (the "EPA"). *See* Complaint, filed May 24, 1989, paras. 14, 15, and Exhibit B.[3] The plaintiffs further allege that "neither EPA nor DEP has commenced an administrative civil penalty action ... to redress the violations prior to the issuance of the March 21, 1989 notice letter." *Id.* para. 4.

On June 22, 1989, the defendant, GAF, moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6). *Fed. R.Civ.P.* 12(b)(6). At that time, GAF claimed that the plaintiffs' complaint was barred by Sections 309(g)(6)(A) and 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. §§ 1319(g)(6)(A), 1365(b)(1)(B),[4] because the DEP had commenced and was diligently prosecuting an administrative proceeding against GAF. In particular, GAF demonstrated that the DEP issued a notice of violation to GAF on March 15, 1989, (prior to the issuance of the plaintiffs' notice of intent to sue), and further, that on May 19, 1989, (prior to the filing of the plaintiffs' complaint), an Administrative Consent Order was executed between GAF and the DEP concerning the violations that are the subject of the plaintiffs' complaint. A hearing was held on GAF's motion on July 26, 1989, at which time this court held that GAF's Rule 12(b)(6) motion must be converted into a Rule 56 motion for summary judgment since matters outside of the pleadings had been submitted. At that time, the case had only been pending for two months. Also, the plaintiffs claimed they needed discovery and it appeared that a number of discovery requests were outstanding. Therefore, this Court denied GAF's motion, without prejudice, pending completion of discovery relevant to any subsequently filed motion for summary judgment.

A scheduling order was entered by the Magistrate on June 13, 1990, indicating that the discovery period on the issue of liability had closed[5] and that all dispositive motions should have been filed prior to July 27, 1990. In accordance with this directive, the defendant filed a motion for summary judgment and the plaintiffs cross-moved for partial summary judgment on the issue of liability, which motions are presently before the court. In its motion, the defendant, GAF, argues that it is entitled to summary judgment on the grounds that this action is barred by Section 309(g)(6) of the Clean Water Act, 33 U.S.C. § 1319(g)(6). It appears that GAF has abandoned its claims that this action is barred by 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B). The plaintiffs argue that based upon GAF's discharge monitoring reports ("DMRs") and supporting laboratory documentation they are entitled to partial summary judgment on the issue of the defendant's liability for 118 discharge violations and 5 reporting violations of the Clean Water Act.

In considering these motions, I shall keep in mind the Rule 56 standard of review. Rule 56 of the Federal Rules provides that "judgment ... shall be rendered forthwith if the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). The moving party has the initial burden of demonstrating that this summary judgment standard has been satisfied (*see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)), which can be accomplished by simply pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see Peters Tp. School Dist. v. Hartford Acc. and Indem. Co.*, 833 F.2d 32, 34 (3d Cir.1987).

---

**3.** The EPA delegated responsibility to the DEP for administering the National Pollutant Discharge Elimination System program in New Jersey on April 13, 1982. *See* 47 Fed.Reg. 17,331 (April 22, 1982).

**4.** (1988).

**5.** Discovery on damages was stayed.

In opposing summary judgment, the non-moving party must come forward with evidence supporting a claim that there is a genuine issue of material fact in dispute which requires resolution by the trier of fact. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). The judge's role is "not to weigh the evidence and determine the truth of the matter," but to determine whether the evidence may reasonably be resolved in favor of either party. *Metzger v. Osbeck*, 841 F.2d 518, 519 (3d Cir.1988). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). All inferences to be drawn from the facts should be resolved in favor of the nonmoving party. *Peters Tp. School Dist.*, 833 F.2d at 34.

With these standards in mind, I turn to a discussion of the legal and factual issues involved in these motions. I shall address the defendant's motion first, as resolution of that motion could obviate the need to consider the plaintiffs' motion, although the converse is not true.

## II. *The Defendant's Motion for Summary Judgment*

### A. Facts

The basic, material facts relative to the defendant's motion for summary judgment are undisputed, although the parties dispute the legal significance of those facts. It is undisputed that the discharge permit which is the subject of the plaintiffs' action was issued to GAF on October 30, 1985, to become effective on December 1, 1985.[6] *See* Certification of Jeffrey A. Cohen, Esq., filed June 30, 1990, Exhibit A. The DEP issued this permit to GAF under the authority delegated to it by the EPA. The permit allows GAF to discharge pollutants into the Preakness Brook in Wayne, New Jersey, from one outfall point only—DSN 001. *Id.*, at 5. Effluent limitations as to the amount of designated pollutants that could legally be discharged from this outfall point are set forth in the permit, and GAF was required to monitor and report to the DEP the amount of its discharges so that the DEP and others could determine whether GAF was complying with those effluent limitations.

On March 15, 1989, the DEP issued a Notice of Violation ("NOV") to GAF stating that GAF exceeded the limitations contained in its discharge permit on various occasions during the period running from February, 1988, through February, 1989, in violation of the New Jersey Water Pollution Control Act, *N.J.Stat.Ann.* § 58:10A–1 to –60 (West 1982 & Supp.1991). It appears that negotiations immediately ensued between GAF and the DEP concerning the exceedences set forth in the Notice of Violation, among others. *See, e.g.*, March 20, 1989 letter from Ed Hoek of GAF to Peter Jordan of the DEP, Certification of Jeffrey A. Cohen, Esq., filed June 30, 1990, Exhibit C.

On April 12, 1989, the DEP contacted GAF and notified it that an Administrative Order would issue for the violations set forth in the Notice of Violation unless GAF wished to negotiate and enter into an Administrative Consent Order ("ACO"). *See* Affidavit of Leonard P. Pasculli, Esq., filed June 30, 1989, para. 4. Rather than resist the citations made by the DEP and require the initiation of formal, adversarial proceedings, GAF capitulated and entered into an ACO following two informal meetings with DEP representatives. *See id.* paras. 5–8.

The ACO was signed by GAF on May 18, 1989, and executed by the DEP on May 19, 1989. *See* Certification of Jeffrey A. Cohen, Esq., filed June 30, 1990, Exhibit B. Prior to the issuance of the ACO, certain factual findings were made by the DEP that were incorporated therein. In particular, the DEP found that

> [a] review of the DMRs submitted to the Department by GAF, in accordance with

---

**6.** Prior to the issuance of this permit, GAF's discharges were regulated by a permit issued by the EPA on April 30, 1976. *See* Plaintiffs' Exhibit 2.

Part I(11) and Part III–B/C(1A) of the DSW Permit, for the period beginning December 1985 and ending April 1989 indicated that GAF had violated its final effluent limitations for various parameters during this period. GAF also failed to report certain parameters on its DMRs. The violations are summarized in Appendix I which is attached hereto and made a part hereof.

ACO, at 2, para. 5, Certification of Jeffrey A. Cohen, Esq., filed June 30, 1990, Exhibit B.

On Appendix I of the ACO, a number of discharge violations (in excess of forty-eight) are listed for the period beginning in August, 1985 and ending April, 1989. In addition, an unspecified number of monitoring and/or reporting violations are listed for the period beginning in April, 1986 and ending July, 1986. In addition to making specific findings as to the violations committed by GAF, the ACO recites a history of relations between GAF and the DEP. In particular, the Order indicates that, over the years, the DEP has been monitoring GAF's facility for compliance with its effluent limitations. In 1987, the DEP notified GAF that its facility was rated "unacceptable" and in response, GAF retained a consultant to assist in preparing and implementing remedial action. *See* ACO, para. 6. In March, 1988, GAF's facility was again rated "unacceptable" by the DEP and again, GAF made operating changes to improve the effluent quality. *Id.* paras. 7, 8. However, although improvements were implemented by GAF, it still failed to achieve compliance which ultimately resulted in the referenced March 1989 NOV and May 1989 ACO.

Under the ACO, GAF was required to further upgrade its waste water treatment facilities and a schedule of compliance was set forth. Improvements were required to be made and completed by July 8, 1990, at which time GAF must have attained full compliance with its effluent limitations set forth in its New Jersey Pollutant Discharge Elimination System ("NJPDES") permit. *See* ACO, para. 15. Subsequently, GAF requested and received from the DEP two extensions of the date set for final

compliance with the ACO (one until August 8, and another until August 27, 1990). *See* Affidavit of Leonard P. Pasculli, Esq., filed September 5, 1990, paras. 3, 5.

In the interim, however, the DEP recognized that GAF did not have the capability to meet its effluent limitations. Thus, interim effluent limitations were set, *see* ACO para. 16, and a penalty was imposed for GAF's past violations as well as the anticipated further violations that would occur during the period that construction was ongoing. In particular, the DEP found,

> based on information submitted by GAF, as well as information in the possession of the Department, the Department finds that GAF may not be able to comply with the effluent limitations of its NJPDES DSW Permit without undertaking improvements to and/or upgrading its facility. Therefore, to amicably resolve the matters described in the above FINDINGS, the Department and GAF enter into this Administrative Consent Order without trial or adjudication of any of the facts or issues contained herein.

ACO para. 14.

With regard to the amount of the penalty which the DEP chose to assess, the ACO provides:

> Pursuant to N.J.S.A. 58:10A–10(d) and N.J.A.C. 7:14–8.1 *et seq.*, and based upon the above FINDINGS, the Department has determined that GAF cannot meet the final effluent limitations contained in the DSW Permit, will with a high degree of probability discharge in violation of these final effluent limitations until the improvements to the Facility are completed, and will be liable for maximum statutory penalties for violations of these final effluent limitations until the date of completion of the improvements to the Facility.
>
> However, in light of the cooperation of GAF in the formulation of this agreement, the Department will compromise its claim for a maximum civil administrative penalty and accept a penalty settle-

ment from GAF in the amount of $227,-000.

ACO para. 19.

Thus, the DEP was clearly aware that it could have, if it so chose, assess maximum statutory penalties of $50,000.00 for each violation occurring after December, 1986, and of $5,000 for each prior violation. *See N.J.Stat.Ann.* § 58:10A–10d (authorizing commissioner of DEP to assess penalties up to $50,000.00 per violation.)[7] However, the ACO states that the DEP chose to forego such maximum penalties "in light of the cooperation of GAF" and the schedule for upgrading GAF's waste water treatment plant.

As I indicated above, on March 21, 1989, NJPIRG sent to GAF, the DEP and the EPA a notice that it intended to sue GAF under the citizen suit provision of the Clean Water Act for violations of its NJPDES occurring between August, 1985 and March, 1989.[8] This notice of intent was sent to GAF and the agencies subsequent to the issuance of the March 15, 1989 NOV by the DEP. The instant suit was filed on May 24, 1989, subsequent to the execution of the aforementioned ACO. The plaintiffs argue that the ACO does not list all of the defendant's violations of its permit during the period covered by that document. The plaintiffs have provided a list of all the violations for which they seek to recover penalties, and after a careful review of the ACO and the plaintiffs' exhibits, it appears that there are fifty-two violations cited by plaintiffs which are not covered by the ACO.[9]

### B. Legal Issues

The defendant argues that the plaintiffs' complaint is barred, in its entirety, by recent amendments to Section 309 of the Clean Water Act, 33 U.S.C. § 1319(g)(6). Since "the starting point for interpreting a statute is the language of the statute itself," *Consumer Product Safety Com'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), I note that the statutory provision at issue provides as follows:

(6) Effect of order

    (A) Limitation on actions under other sections

        Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect

---

**7.** The New Jersey Water Pollution Control Act was amended, effective December, 1986, and the statutory maximum penalty amount was increased from $5,000.00 to $50,000.00. As amended, the statute authorizes such a penalty for "each day during which such violation continues" as such continuing violations "constitute an additional, separate and distinct offense." § 58:10A–10d.

**8.** It appears that plaintiffs have abandoned their claims which are based upon violations occurring between August 1985 and December 1, 1985. *See* plaintiffs' Revised Exhibit 5 (listing violations for which plaintiffs seek civil penalties dating from December 2, 1985).

**9.** As the above discussion makes clear, the ACO encompasses those violations occurring during the period between the execution of the ACO (May 19, 1989), and July 8, 1990. Thus, these fifty-two violations "missed" by the DEP are those on plaintiffs' Exhibit 5 which are preceded by the following numerical prefixes: 1 through 23, 25 through 39, 43, 44, 47, 49, 50, 57, 59, 61, 69, 76, 83, and 86. *Compare* ACO, Appendix I.

    Forty-four of these violations are based not upon the DMRs, but upon the plant logs. (Although plaintiffs argue that the DEP must have neglected to review GAF's plant logs, this is rebutted by the violations numbered 24 and 85 on plaintiffs' Exhibit 5. Plaintiffs indicate that they must base these violations on the plant logs while they are also cited by the DEP in the ACO.)

    The remaining seven violations basically concern what appear to be relatively minor deviations. (For example, violation numbered 44 involved a discharge of 50.30 mg/1 COD, when the permit required a maximum of 50.00 mg/1; violation numbered 49 involved a discharge of 1.30 mg/1 TRC when the permit required a maximum of 1.00 mg/1 TRC; violation numbered 57 involved a discharge of 8.50 mg/1 TSS when the permit required a maximum of 8.0 mg/1 TSS; violation numbered 59 involved a flow discharge of .13 MGD when the permit required a maximum flow of .10 MGD; violation numbered 61 involved a discharge of 8.0 mg/1 BOD when the permit required a maximum of 8.0 mg/1 BOD, and violation numbered 69 involved a discharge of 8.30 mg/1 BOD when the permit required a maximum of 8.0 mg/1 BOD. The last violation "missed" by the DEP and not based upon the plant logs—violation numbered 83—is more substantial as it involves a discharge of 4.09 mg/1 Amm(NH₃N), when the permit required a maximum discharge of 2.0 mg/1.)

or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation—

(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,

shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

(B) Applicability of limitation with respect to citizen suits

The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which—

(i) a civil action under section 1365(a)(1) of this title has been filed prior to commencement of an action under this subsection, or

(ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

33 U.S.C. § 1319(g)(6)(A)–(B).

Obviously, Section 309(g)(6)(A)(i) does not apply here because the EPA has apparently taken no action with respect to GAF's violations. In addition, I find that the plaintiffs' suit is not barred by Section 309(g)(6)(A)(ii), 33 U.S.C. § 1319(g)(6)(A)(ii), but rather, if any subsection to Section 309 bars plaintiffs' suit, it is subsection 309(g)(6)(A)(iii), 33 U.S.C. § 1319(g)(6)(A)(iii).

▮ Subsection (g)(6)(A)(ii) of Section 309 speaks in the present tense. It states that if a state *"is* diligently prosecuting an action" for violations of the Clean Water Act, then a citizen suit for such violations shall be barred. 33 U.S.C. § 1319(g)(6)(A)(ii) (emphasis added). Notably, the statutory provision does not state that a citizen suit is barred if a state *has* prosecuted an action with respect to such violations, although Congress could have easily so provided. In contrast, subsection (g)(6)(A)(iii) of Section 309 provides that a citizen suit shall be barred if the State *"has issued* a final order ... and the violator has paid a penalty assessed under this subsection"* for such violations. 33 U.S.C. § 1319(g)(6)(A)(iii) (emphasis added).

The undisputed facts of this case, as discussed above, reveal that the DEP is not presently prosecuting an administrative action against GAF, and it was not prosecuting an action against GAF at the time suit was filed. Rather, the DEP had already entered into an ACO and assessed penalties against GAF at the time suit was filed. Accordingly, subsection (g)(6)(A)(iii) of Section 309 applies, if any.

A distinction must be made between these two provisions, because otherwise, they would be superfluous.

The plaintiffs argue that their suit is not barred by Section 309(g), because: (1) the administrative agency proceedings were not commenced prior to the issuance of their notice letter and/or the commencement of this suit; (2) the state law is not "comparable" to the Clean Water Act, within the meaning of Section 309; and (3) the DEP did not diligently prosecute the administrative proceeding.

### C. Analysis

▮ Subsection (g)(6)(B) relates back to subsections (A)(ii) and (iii)—all of which relate to the "commencement" of administrative proceedings. Certain administrative proceedings, which are ongoing, do not bar citizen suits. However, once the agen-

cy obtains a final order and collects penalties as to a certain violation under the Clean Water Act, or under a comparable state law, the citizen suit is barred. The penalties would be paid to the government in any event. If the government has already assessed those violations and determined to assess a certain amount of penalties under the Clean Water Act or a comparable state law, there is no reason to step on the agency's toes and impose an additional penalty which the agency chose to forego. I find, however, that the state administrative action that was brought against GAF by the DEP was not "comparable" to an action brought under the Clean Water Act, within the meaning of Section 309.

The powers of the DEP to enforce the New Jersey Water Pollution Control Act are expansive. Section 58:10A–10 authorizes the DEP to assess the fines and penalties which are at issue in this case.

Section 58:10A–10 provides:

Violations; remedies, fines and penalties; enforcement; forfeiture of conveyances

   a. Whenever, on the basis of any information available to him, the commissioner finds that any person is in violation of any provision of this act, or any rule, regulation, water quality standard, effluent limitation, or permit issued pursuant to this act he shall:

   . . . .

   (3) Levy a civil administrative penalty in accordance with subsection d. of this section;

Subsection d. provides:

   d. The commissioner is authorized to assess a civil penalty of not more than $50,000.00 for each violation and each day during which such violation continues shall constitute an additional, separate, and distinct offense. Any amount assessed under this subsection shall fall within a range established by regulation by the commissioner for violations of similar type, seriousness, and duration. No assessment shall be levied pursuant to this section until after the discharger has been notified by certified mail or personal service. The notice shall in-

clude a reference to the section of the statute, regulation, order or permit condition violated; a concise statement of the facts alleged to constitute a violation; a statement of the amount of the civil penalties to be imposed; and a statement of the party's right to a hearing. **The ordered party shall have 20 days from receipt of the notice within which to deliver to the commissioner a written request for a hearing. After the hearing and upon finding that a violation has occurred, the commissioner may issue a final order after assessing the amount of the fine specified in the notice. If no hearing is requested, then the notice shall become a final order after the expiration of the 20–day period.** Payment of the assessment is due when a final order is issued or the notice becomes a final order. The authority to levy an administrative order is in addition to all other enforcement provisions in this act, and the payment of any assessment shall not be deemed to affect the availability of any other enforcement provisions in connection with the violation for which the assessment is levied. Any civil penalty assessed under this section may be compromised by the commissioner upon the posting of a performance bond by the violator, or upon such terms and conditions as the commissioner may establish by regulation.

*N.J.Stat.Ann.* § 58:10A–10 (underline in original indicating last additions in text) (emphasis supplied).

The New Jersey Water Pollution Control Act clearly sets forth a procedure for the assessment of civil administrative penalties and provides for notice to the violator before a penalty is assessed, as well as the opportunity for a hearing on the penalty. Nowhere does it provide for notice to the public. In contrast, Section 309(g)(4)(A) of the Clean Water Act provides for public notice and participation before the assessment of a civil order.

Section 309(g)(4)(A) provides:

(A) Public Notice

   Before issuing an order assessing a civil penalty under this subsection the

Administrator or Secretary, as the case may be, **shall provide public notice of and reasonable opportunity to comment on the proposed issuance of such order.**

33 U.S.C. § 1319(g)(4) (emphasis supplied).

The ACO issued by the DEP in May 1989 was issued pursuant to the New Jersey Water Pollution Control Act, *N.J.Stat.Ann.* 58:10A–1 to –60. ACO, p. 1. Civil administrative penalties were assessed against GAF under Section 58:10A–10a(3), d. Neither the New Jersey Pollution Control Act nor the regulations promulgated under this Act provided the public with the opportunity for public comment or a hearing on the proposed ACO. Had GAF requested a hearing, the DEP would have been required to notify the public and allow intervention as of right to interested citizens. *N.J.Admin.Code* tit. 7, § 7:14A–8.13 (Supp. 7-17-89). These notice and hearing procedures were not applicable in this case because GAF did not request a hearing. Because GAF did not request a hearing and agreed to a settlement, the public did not have an opportunity to participate.

In response to comments on proposed amendments to *N.J.Admin.Code* tit. 7, § 7:14A–8.4 that the regulations should provide citizens with the same rights to adjudicatory hearings as permittees, the DEP stated:

> The Department does not believe that the statutory scheme established in the Water Pollution Control Act provides anyone other than the violator with a right to an adjudicatory hearing on a notice of civil administrative penalty assessment or an administrative order issued pursuant thereto.

Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment, Exhibit 7 at 11.

■ This court notes that the New Jersey Water Pollution Control Act does not provide the public with notice and opportunity to participate in the assessment of civil administrative fines and penalties, and for this reason this court finds that the state administrative action that was brought against GAF by the DEP was not comparable to action under the Clean Water Act within the meaning of Section 309. Because the state administrative action against GAF was not comparable to an administrative action under the Clean Water Act, the plaintiffs' citizen suit is not barred under Section 309(g)(6)(A)(iii).

For these reasons I deny the defendant's motion for summary judgment. I will now address the plaintiffs' cross-motion for partial summary judgment on the issue of liability.

III. *The Plaintiffs' Motion for Partial Summary Judgment*

A. Jurisdiction

■ This Court has jurisdiction pursuant to 33 U.S.C. § 1365(a). The plaintiffs have correctly pleaded in the complaint that GAF has continuously or intermittently violated the National Pollution Discharge Elimination System ("NPDES") permit issued to GAF by the DEP and continues to be in violation of the Clean Water Act. *See Gwaltney v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); Complaint, filed May 24, 1990, paras. 15, 20.

B. Legal Issues

The plaintiffs argue that they have standing under Section 505 of the Clean Water Act to bring this action. The plaintiffs contend that they have satisfied the standing requirements to bring this suit by demonstrating that as a result of the alleged effluent discharges by GAF their members are being and will be adversely affected with regard to their health, economic, recreational, aesthetic and environmental interests in the Preakness Brook, the Passaic River, and tidally related waters. *See* Complaint, filed May 24, 1990, para. 7, and Plaintiffs' Brief in Support of Their Motion for Partial Summary Judgment, Exhibit 1.

Moreover, the plaintiffs assert that they are entitled to partial summary judgment on the issue of liability for 123 violations by GAF of their NPDES permit including: 1) 118 effluent discharge violations during the period December, 1985 through June,

1990, and 2) 5 reporting violations during the period January, 1986 through December, 1988. *See* Plaintiffs' Revised Exhibits 5–6.

In opposition to the plaintiffs' motion for partial summary judgment the defendant argues that the plaintiffs have not established standing to maintain a citizen suit under the Clean Water Act because the plaintiffs are unable to demonstrate: (1) A distinct and palpable injury to its members, (2) that can fairly be traced to the defendant, and (3) that is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United,* 454 U.S. 464, 472–75, 102 S.Ct. 752, 758–60, 70 L.Ed.2d 700 (1982). Also, the defendant revives its argument that this suit is barred in its entirety by Section 309 of the Clean Water Act, 33 U.S.C. § 1319(g)(6). Accordingly, the defendant contends that the plaintiffs' motion for partial summary judgment should be denied and this suit dismissed.

### C.  Standing

■ The standing provisions of Section 505 of the Clean Water Act which authorizes suit "against any person ... who is alleged to be in violation of [a NPDES/NJPDES permit or condition thereof]" by "any person or persons having an interest which is or may be adversely affected," 33 U.S.C. §§ 1365(a)(1), (g), were based upon the Supreme Court's holding in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See* Senate Consideration of Conference Report, 93rd Cong., 1st Sess. (1972) *reprinted in* A Legislative History of the Water Pollution Control Act Amendments of 1972, Senate Comm. on Public Works, Vol. I, at 221 (1973). In *Morton,* the Court recognized that standing can be based on environmental, aesthetic and non-economic injury, as well as the more traditional notions of economic and physical injury. *Morton,* 405 U.S. at 738, 92 S.Ct. at 1367. Of course standing under the Clean Water Act must be in accord with the Constitutional requirements for standing which the defendant correctly laid out in its argument. With these Constitutional standards in mind, this court has repeatedly held that injury for standing purposes can be injury to aesthetic, recreational or environmental values. *SPIRG v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1082 (D.N.J.1986). *See SPIRG v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1199–2000 (D.N.J.1985). "These injuries need not be large, an 'identifiable trifle' will suffice." *PIRG v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 71 (3d Cir.1990) (quoting *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)) *cert. denied,* — U.S. —, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

■ While the plaintiffs have demonstrated a distinct and palpable injury to their members' use and enjoyment of the Passaic River,[10] the defendant argues that the alleged injuries to the plaintiffs are insufficient to confer standing to sue because the defendant does not discharge directly into the Passaic River. The defendant asserts that because it does not discharge directly into the Passaic River, the plaintiffs have failed to demonstrate that their members have suffered actual harm fairly traceable to GAF's alleged permit violations. This court does not agree.

■ The defendant's argument does not have a legal basis. The Clean Water Act does not place any milage limits on standing. Nor does the Clean Water Act require the plaintiffs to demonstrate that they use the exact tributary into which the defendant discharges rather than the waters into which that tributary flows. Recently, Judge Thompson of this court addressed the issue of whether the standing provisions of Section 505 of the Clean Water Act require the plaintiffs to demonstrate that they utilize the waterway into which the

---

**10.** Plaintiffs have submitted 4 affidavits of individual members of NJPIRG and FOE who engage in recreational activities, such as walking, jogging, boating, swimming, and fishing in specific portions of the Passaic River downstream from defendant's facility and in nearby lands, or would engage in such activities in those areas if the Passaic River were not so polluted. *See* Plaintiffs' Brief in Support of Their Motion for Summary Judgment, Exhibit 1.

defendant directly discharges. In *PIRG v. Yates Industries, Inc.*, 757 F.Supp. 438, 443 (D.N.J.1991), my colleague held that, "[i]t is enough to show that plaintiffs' members have suffered injuries through waters directly affected by any illegal discharges." *Id.*

I too reject this argument by the defendant and hold that the plaintiffs have established standing to bring this suit under Section 505 of the Clean Water Act. The defendant has conceded that it discharges into the Preakness Brook which flows through a pond, empties into the Singac Brook and flows into the Passaic River. *See* Defendant's Brief in Opposition to Plaintiffs' Motion for Summary Judgment, at 5. Were I to accept the defendant's argument, the effect would be to prohibit any citizen suits against violators of the Clean Water Act unless the violation was so great or the waterway so small that the direct impact of the discharges could be pinpointed. This interpretation of the Clean Water Act would be contrary to its intent. *See PIRG v. Yates Industries, Inc.*, 757 F.Supp. at 443; *SPIRG v. Jersey Central Power & Light Co.*, 642 F.Supp. 103, 106–107 (D.N.J.1986); *SPIRG v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1397 (D.N.J.1985).

■ Moreover, as recently expressed by the Third Circuit in *PIRG v. Powell Duffryn Terminals, Inc.*, 913 F.2d at 73 n. 10, the plaintiffs need not show "to a scientific certainty" that the pollution that they saw in the Passaic River came from GAF's effluent. Such tort-like causation is not required to establish standing under Article III. To negate the plaintiffs' affidavits establishing injury to the aesthetic, recreational or environmental values of NJPIRG and FOE members, GAF must show either: 1) That it does not discharge pollutants into the Passaic River or its tributaries; or 2)

that the plaintiffs' statements that the river is foul-smelling and polluted are in fact untrue. GAF has not made this requisite showing. Accordingly, I find that the aesthetic injury suffered by the plaintiffs may fairly be traced to GAF's effluent discharges, establishing plaintiffs' standing to bring this suit.

## D. Liability

■ Next, I will address the issue of liability. In opposition to the plaintiffs' motion for partial summary judgment on the issue of liability, the defendant restates the argument that this suit is barred in its entirety by Section 309 of the Clean Water Act, 33 U.S.C. § 1319(g)(6) because the violations at issue were the subject of a prior administrative enforcement action by the DEP. As discussed earlier, this court holds that the state administrative action that was brought against GAF by the DEP was not comparable to the Clean Water Act within the meaning of Section 309, and does not bar this citizen suit under Section 309(g)(6)(A)(iii).

The plaintiffs assert that they are entitled to partial summary judgment on the issue of liability for 123 violations by GAF of their NPDES permit since there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.[11]

■ It is well established that records required to be kept by law, such as DMRs, may be deemed to be admissions for purposes of establishing civil liability. *Garner v. United States*, 424 U.S. 648, 665, 96 S.Ct. 1178, 1188, 47 L.Ed.2d 370 (1976). This rule has been specifically applied to records kept pursuant to requirements of the Clean Water Act. *United States v. Ward*, 448 U.S. 242, 254, 100 S.Ct. 2636, 2644, 65 L.Ed.2d 742 (1980). Consequently, there can be no question that the data

---

**11.** Originally, plaintiffs argued that based upon GAF's discharge monitoring reports ("DMRs") and supporting laboratory documentation they were entitled to partial summary judgment on the issue of defendant's liability for 121 discharge violations, 8 reporting violations, and 33 monitoring violations of the Clean Water Act.

As the result of additional discovery, plaintiffs have amended their motion for partial summary judgment and are seeking civil penalties for 118 discharge violations and 5 reporting violations by GAF of their NPDES permit. *See* Plaintiffs' Revised Exhibits 5–6.

disclosed in the defendant's DMRs may be accepted as true.

Furthermore, it is clear that failure to comply with a limitation in a NPDES permit is a violation of the Act. 33 U.S.C. § 1311 (1988). *SPIRG v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1087–1088 (D.N.J.1986). Section 505 of the Act authorizes citizen suits for violations of effluent standards or limitations. 33 U.S.C. § 1365(a). "Effluent standard or limitation" is defined in Section 505(f)(6) of the Act to include "a permit or a condition thereof issued under Section 402." 33 U.S.C. § 1365(f). Section 402(a)(2) provides that the Administrator shall prescribe conditions for permits to assure compliance with the requirements of the Act, "including conditions on data and information collection, reporting and such other requirements as he deems appropriate." 33 U.S.C. § 1342(a)(2) (1988). The monitoring and reporting requirements of a permit, like the discharge limitations, are therefore fully enforceable effluent limitations.

■■■ This court and other federal courts have regularly granted summary judgment to plaintiffs in citizen suits under the Clean Water Act in cases based on discharge monitoring reports and violations of monitoring and reporting requirements of NPDES permits. *PIRG v. Witco,* 31 E.R.C. 1571, 1990 WL 66178 (D.N.J.1990); *SPIRG v. Jersey Central Power and Light Co.,* 642 F.Supp. 103, 105–106 (D.N.J.1986); *SPIRG v. Georgia–Pacific Corp.,* 615 F.Supp. 1419, 1429–1430 (D.N.J.1985); *SPIRG v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1539, n. 14 (D.N.J.1984) *aff'd on other grounds,* 759 F.2d 1131 (3d Cir.1985).

Having found no genuine issue of material fact as to defendant's liability under the Clean Water Act for 118 discharge violations and 5 reporting violations by GAF of the permits issued to it by the DEP, I hereby grant the plaintiffs' motion for partial summary judgment on the issue of liability for these 123 violations.

## IV. *Conclusion*

The defendant's motion for summary judgment is denied. The plaintiffs' cross-motion for partial summary judgment on the issue of liability is granted. The plaintiffs have reserved the right to seek a preliminary injunction and permanent injunctive relief. In addition, plaintiffs seek civil penalties and costs, including attorneys' fees and will request a hearing to address these issues. *See* Plaintiffs' Brief in Support of Their Motion for Summary Judgment, at 1–2.