PUBLIC INTEREST RESEARCH
GROUP OF NEW JERSEY,
INC., et al., Plaintiffs,

v.

HERCULES, INC., Defendant.

Civ. A. No. 89–2291(JBS).

United States District Court,
D. New Jersey.

March 31, 1993.

1. Plaintiffs' Motion for Partial Summary Judgment as to Liability and for Permanent Injunctive Relief;

2. Defendant's Cross Motion for Summary Judgment;

3. Defendant's Motion in Limine to Bar Evidence Regarding Hercules' Kenvil Facility;

4. Defendant's Motion in Limine to Bar the Proposed Trial Testimony of Michael O'Donnell Regarding the Application of the NJDEPE and the EPA Civil Penalty Policies; and

5. Plaintiffs' Notice of Appeal of Magistrate Judge Rosen's March 11, 1992 Order, in which Judge Rosen ruled that a certain memorandum relied upon by Michael O'Donnell, a paralegal in plaintiffs' attorneys' office, was not work product and ordered that the memorandum be turned over to defendant.

Carolyn Smith Pravlik, Bruce J. Terris, Elisabeth J. Lyons, Robert D. Parrish, Terris, Pravlik & Wagner, Washington, DC, Edward Lloyd, Newark, NJ, for plaintiffs.

Joel Schneider, E. Lynne Hirsch, Manta and Welge, Princeton, NJ, for defendant.

## OPINION

SIMANDLE, District Judge:

This case involves a citizen suit brought under § 505 of the Federal Water Pollution Control Act (the "Clean Water Act" or the "Act"), 33 U.S.C. § 1365, by the Public Interest Research Group of New Jersey ("NJPIRG") and Friends of the Earth ("FOE") against defendant Hercules, Inc., a Delaware corporation doing business in New Jersey. Plaintiffs allege that defendant has committed numerous discharge, monitoring, reporting and recordkeeping violations of the discharge permit issued to it pursuant to § 402 of the Act, 33 U.S.C. § 1342. The court presently has before it the following motions filed by both parties:

## BACKGROUND

The Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., was enacted in 1972 and effected "a major change in the enforcement mechanism of the federal water pollution control program from water quality standards to effluent limits." S.Rep. No. 414, 92d Cong., 1st Sess., reprinted in A Legislative History of the Federal Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess., Vol. 2 at 1425, 1972 U.S.Code Cong. & Ad.News at 3668, 3675. In furtherance of this underlying shift in emphasis from water quality standards to discharge control, the Clean Water Act prohibits the discharge of pollutants into the nation's waters except as specifically authorized by the Act. This authorization comes in the form of discharge permits, which are issued pursuant to Title IV of the Act, 33 U.S.C. §§ 1341–1345.

The permit program applicable in this case is established in § 402 of the Act—the National Pollutant Discharge Elimination System ("NPDES"). Section 402(a)(1), 33 U.S.C. § 1342(a)(1), authorizes the Administrator of the United States Environmental Protection Agency (the "EPA") to issue dis-

charge permits in accordance with national standards promulgated by the Administrator. NPDES permits require permittees to establish and maintain records; to install, use, and maintain monitoring equipment; to sample effluent; and to submit regular reports to the EPA. 33 U.S.C. § 1318(a)(4)(A). These reports are known as "discharge monitoring reports" ("DMRs") and they must be submitted at regular intervals specified in the permit. 40 C.F.R. § 122.41(1)(4). Criminal penalties can be imposed for the submission of false information in the DMRs. 40 C.F.R. § 122.41(k)(2). In addition, permittees have an affirmative obligation to correct any past errors or omissions in reporting of which they subsequently become aware. 40 C.F.R. § 122.42(1)(8).

On September 10, 1975, the EPA issued NPDES permit number NJ 0005134, effective October 31, 1975, to defendant Hercules. The 1975 permit authorized defendant to discharge limited quantities of pollutants from its Gibbstown, Gloucester County, New Jersey facility into the Delaware River (outfall 001) and Clonmell Creek (outfall 002), in accordance with the conditions set forth therein. Hercules' 1975 permit expired on October 31, 1980. EPA regulations provide, however, that the terms of an expired EPA issued permit remain in effect until the effective date of a new permit. 40 C.F.R. § 122.6.

In April 1982, the EPA delegated responsibility to the New Jersey Department of Environmental Protection and Energy ("NJDEPE") for administering the NPDES program in New Jersey. 47 Fed.Reg. 17331 (April 13, 1982). On June 11, 1985, the NJDEPE issued NJPDES permit number NJ 0005134, effective August 1, 1985, to defendant. The 1985 permit likewise authorized Hercules to discharge limited quantities of pollutants into the Delaware River and Cronmell Creek (which flows into the Delaware River) from its Gibbstown facility through the two aforementioned discharge points, outfalls 001 and 002, in accordance with the conditions set forth therein.

The NJDEPE issued a permit modification to Hercules on October 9, 1987. That modification became retroactively effective on July 2, 1986. Under New Jersey law, the expired 1985 permit, as modified, remains in effect until a new permit is issued by the State. N.J.S.A. 52:14B–11; N.J.A.C. 7:14A–2.3.

On March 21, 1989, plaintiffs [1] gave notice of defendant's violations and of plaintiffs' intent to file suit for such violations to the Administrator of the EPA, the NJDEPE, and to defendant Hercules. Plaintiffs gave this notice in order to comply with Section 505 of the Act, which requires the providing of at least sixty days notice before a party can file a citizen suit under the Act. 33 U.S.C. § 1365(b)(1)(A). This notice listed only sixty-eight (68) specific discharge violations which occurred from April 1985 through February 1989. Def.Ex. 9. It did not list any other type of alleged violation of Hercules' permit, i.e., monitoring, reporting, or recordkeeping violations. Id.

Plaintiffs filed their Complaint on May 24, 1989. In their Complaint, plaintiffs asserted that Hercules "has failed in numerous instances including, but not limited to, those listed in Appendix B to this Complaint to comply with its permit, including failure to comply with the effluent limitations and to monitor its discharge properly." Def.Ex. 11 (Complaint) at ¶ 22. In Appendix B, plaintiffs specifically listed only eighty-seven (87) alleged discharge violations. Def.Ex. 11. Thirty-one (31) of the discharge excursions listed in Appendix B to plaintiffs' Complaint were not listed in plaintiffs' sixty-day notice letter.[2] See Joint Final Pre–Trial Order ("JFPTO"), dated Sept. 3, 1991, at p. 33, ¶ 122.

Plaintiffs have only filed the one, March 21, 1989 notice. They have never sought to file any additional sixty-day notices. See JFPTO at p. 33, ¶ 123.[3] Nor, for that mat-

---

**1.** Plaintiff FOE joined in plaintiff NJPIRG's March 21, 1989 notice on March 29, 1989. See Def.Ex. 10.

**2.** These are items 12, 35, 37, 40, 43, 47, 48, 55, 59, 63–68, 71, 79–90 and 94–96 on plaintiffs' Revised Exhibit 8.

**3.** This fact also was confirmed by the parties at oral argument.

ter, have plaintiffs ever filed an amended Complaint. Over the course of this litigation, however, plaintiffs have added to the total number—and type—of alleged violations for which they seek to hold defendant liable. They have asserted these additional allegations through various "informal" amendments in the course of briefing the currently pending motions. (Plaintiffs also have withdrawn certain allegations as well as changed certain specific allegations from one category to another, e.g., certain instances previously alleged to have been monitoring violations now are listed as recordkeeping violations.) In sum, after having made several corrections and amendments, the plaintiffs allege that Hercules committed 114 discharge violations (i.e., violations of the permit's specific limitations on the levels of pollutants Hercules was authorized to discharge through outfalls 001 and 002), 328 monitoring violations, 58 reporting violations, and 228 recordkeeping violations.[4]

On May 5, 1989, after receipt of plaintiffs' sixty-day notice but before the actual filing of the Complaint, Hercules received a Notice of Civil Penalty Assessment from the NJDEPE. Hercules objected to this notice on May 24, 1989. The matter was then referred to the New Jersey Office of Administrative Law. Hercules and the DEP engaged in settlement negotiations, which culminated in the execution of an Administrative Consent Order ("ACO") in March, 1991.[5] Def.Ex. 18. Under the ACO, Hercules was required to pay the NJDEPE $600,000 as a penalty for 115 permit violations which occurred from March, 1985—August, 1990. In addition to this penalty, Hercules agreed to take various measures to protect against any future violations, including an agreement to implement an in-stream monitoring program and to develop a water quality model, acceptance of more stringent effluent limitations earlier than might otherwise have been required, and various construction requirements. Def.Ex. 18. All of the violations addressed by the NJDEPE in the March, 1991 ACO are included among the discharge violations alleged by plaintiffs.

## DISCUSSION

### I. Summary Judgment Motions

■ Plaintiff has moved for partial summary judgment as to liability and for perma-

---

**4.** The alleged violations are broken down as follows:

A. Discharge violations—113 of the 114 listed discharge violations were previously addressed by the NJDEPE in an administrative action discussed *infra*. These violations concern instances where defendant discharged pollutants in excess of the limitations imposed by its permit. While arguing that the penalties already imposed by the NJDEPE are adequate and that this court therefore should not impose any additional penalties, Hercules disputes only a relatively small number of these 114 discharge violations on the merits. One of the listed violations concerns an alleged June, 1986 excessive discharge of total suspended solids ("TSS"). Hercules contends this discharge did not in fact constitute a violation of its permit. Hercules also contends that it cannot be held liable for other alleged violations because it is entitled to an "upset" defense.

B. Monitoring violations—
1. "Holding time" violations
* 208 instances in which defendant allegedly did not analyze samples of total residual chlorine ("TRC") and pH before the time limit specified in the permit for holding samples had run
* 4 alleged holding time violations for Fecal Coliform ("FC")
* 1 alleged holding time violation for $BOD_5$

2. 70 occasions where defendant allegedly failed to follow the proper sampling method for testing $BOD_5$ % Removal
3. 18 instances where Hercules failed to monitor at outfall 002
4. 27 other instances of a failure to comply with the permit's monitoring requirements which Hercules does not dispute as having occurred but asserts were inadvertent or due to outside lab errors

C. Reporting violations—58 alleged violations of the permit's reporting requirements. Of the 58, 52 of the alleged violations concern instances where Hercules erroneously reported the kind of sample that was taken.

D. Recordkeeping violations—228 alleged paperwork and clerical errors where, for example, either the initials of the person who took certain samples or the exact test method used was not listed.

**5.** Hercules previously entered into an Administrative Consent Order in 1986 regarding groundwater contamination at its Gibbstown Facility. *See* Def.Ex. 5. Defendant also was found to have violated its permits at its Kenvil facility in New Jersey from 1978 until 1984. *See SPIRG v. Hercules, Inc.*, 29 ERC 1417, 1989 WL 159629 (D.N.J.1989). The court in that case assessed the statutory maximum penalty against the defendant. *Id.*

nent injunctive relief enjoining defendant from violating the Clean Water Act in the future.[6] In addition to opposing plaintiffs' motion, the defendant has cross-moved for summary judgment.

As is suggested by the fact that each side has made about two dozen submissions to the court in connection with these motions, the parties vigorously contest virtually every issue presently before the court. Defendant asserts that as a matter of law, it is entitled to summary judgment as to those violations not mentioned in plaintiffs' sixty-day notice. It also argues that plaintiffs should not recover additional penalties for those violations addressed by the NJDEPE in its March, 1991 ACO. Defendant further contends that it is entitled to summary judgment, or that at least a genuine issue of fact exists to preclude summary judgment for plaintiffs, on certain alleged violations because these violations either did not occur, were "merely" the result of typographical errors on certain documents, or were covered by a statutory upset defense.

As further discussed below, the court finds at the threshold that defendant is entitled to summary judgment on those violations not noticed in plaintiffs' statutorily required sixty-day notice letter. The court recognizes that as a matter of equity, plaintiffs probably have many more arguments in their favor on this question. But after a careful, exhaustive review, I conclude that this result is constrained by the pertinent statutory provisions and regulatory language, as well as the applicable case law.

A. *Sixty-day Notice Requirement*

Section 505(b)(1), 33 U.S.C. § 1365(b)(1), provides in pertinent part:

No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]

33 U.S.C. § 1365(b)(1). That provision further requires that *"[n]otice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation." Id.* (emphasis added).

The procedures prescribed by the Administrator of the EPA to govern the Act's notice requirements are set forth at 40 C.F.R. § 135.1, *et seq.* The specific content requirements of the notice are set forth at § 135.3(a), which provides:

*Violation of standard, limitation, or order.* Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

Defendant argues that § 505(b) and the accompanying regulations are clear, unambiguous and not subject to any exceptions. Defendant argues that plaintiffs are statutorily precluded from bringing suit upon any violations not previously mentioned in their sixty-day notice, and that defendant thus is entitled to summary judgment on those violations not so mentioned therein. The plaintiffs' sixty-day notice listed sixty-eight discharge excursions which had occurred from April 1985 through February 1989. The notice did not allege any monitoring, reporting, or recordkeeping violations. Def.Ex. 9. Moreover, thirty-one of the discharge violations listed on the Complaint were not listed

---

**6.** In support of their motion, plaintiffs have submitted copies of defendant's own DMR's, laboratory reports, and other documentation. It is well-established that courts may rely on such documents in granting summary judgment as to liability in Clean Water Act cases. *Public Interest Research Group of New Jersey, Inc. v. New Jersey* *Expressway Authority*, 822 F.Supp. 174, 185 (D.N.J.1992) (Gerry, C.J.) (citing cases). Plaintiffs also seek in this action imposition of civil penalties and costs, including attorney's fees. The instant motion does not address these remedies, though. They will be addressed in due course.

in the plaintiffs' March 21, 1989 notice letter. *See* note 2, *supra.*

In support of its position, defendant cites the Supreme Court's decision in *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), which involved an analogous notice provision in the Resource Conservation and Recovery Act ("RCRA").[7] In *Hallstrom,* the Supreme Court held that "the notice and 60–day delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision; a district court may not disregard these requirements at its discretion." *Id.* at 31, 110 S.Ct. at 311. The Supreme Court's holding in *Hallstrom* has subsequently been applied to Clean Water Act cases. *See, e.g., National Environmental Foundation v. ABC Rail Corp.,* 926 F.2d 1096, 1097 (11th Cir.1991) (holding that "the 60–day notice requirement of 33 U.S.C. § 1365(b) is a mandatory condition precedent to the filing of a citizen suit under the Clean Water Act") (Powell, J. (Ret.)).

Plaintiffs cite four cases in support of their position. Three of these cases were decided prior to *Hallstrom.* Defendant argues, and the court agrees, that these cases therefore are all but irrelevant. In the fourth case, *PIRG v. Witco Chemical Corp.,* C.A. No. 89–3146, 90–968, 1990 WL 512262 (D.N.J. June 28, 1990), the court held that the plaintiffs'

notice letter, which, like the letter at issue here, failed to list every violation subsequently claimed in the complaint, was broad enough to cover the violations added by plaintiffs after discovery. *Id.* slip op. at 4.

Plaintiffs assert that their notice letter contained a list of all the effluent violations discoverable by them as of March 21, 1989, the day on which they mailed the letter. Pl.Reply Br. at 4. They also note that their letter specifically stated:

> The attached list is based on available permit records on file at the offices of EPA Region 2 in New York City. In some instances, information was missing from the public files. We therefore expect to request information from your records to bridge these data gaps and to supplement the lists of violations based on that information.

Def.Ex. 9. Plaintiffs argue that this letter "thus put defendant on notice that it was violating the Act, that corrective action was necessary, and that plaintiffs expected to add to the lists of violations through discovery." Pl.Reply Br. at 5. They further argue that by virtue of the statutory definition of "an effluent standard or limitation,"[8] their letter effectively put defendant on notice of monitoring and reporting violations even though the letter[9] did not explicitly refer to monitoring and reporting violations. *Id.*

---

7. RCRA provides that "No action may be commenced ... prior to sixty days after the plaintiff has given notice of the violation...." 42 U.S.C. § 6972(b)(1).

8. "Effluent standard or limitation" is defined by § 505(f)(6) of the Act to include "a permit or condition thereof issued under [§ 402 of the Act, 33 U.S.C. § 1342]." 33 U.S.C. § 1365(f)(6). Section 402(a)(2) provides, in turn, that the Administrator shall prescribe conditions for permits to assure compliance with the requirements of the Act, "including conditions on data and information collection, reporting, and such other requirements as he deems appropriate." 33 U.S.C. § 1342(a)(2). Section 308, which is referenced by § 402, further describes the monitoring, reporting, and recordkeeping requirements of the Act. Section 308(a)(4)(A) provides that the Administrator shall require a permittee to:

> (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods ..., (iv) sample such effluents ..., and (v)

provide such other information as he may reasonably require.

33 U.S.C. § 1318(a)(4)(A).

9. Plaintiffs' letter, which was addressed to Hercules' plant manager, was one and one-quarter pages long and stated in its entirety:

> Section 505(b) of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(b), requires that 60 days prior to the filing of a citizen suit in federal district court under section 505(a) of the Act, the alleged violator, the U.S. Environmental Protection Agency, and the State in which the alleged violations occur must be given notice of the alleged violations.
>
> The Public Interest Research Group of New Jersey, Inc., 84 Paterson Street, New Brunswick, NJ 08901 [phone number] hereby places you on notice, pursuant to Section 505(b) of the Act, 33 U.S.C. 1365(b), that it believes that your facility in Gibbstown, New Jersey, has violated and continues to violate "an effluent standard or limitation" under Section 505(a)(1)(A) of the Act, 33 U.S.C. 1365(a)(1)(A),

Hercules argues that because the notice letters and complaints in *Witco* are not part of this record, it is impossible to determine if that case has any relevance here. Def.Reply Br. at 1. It also attempts to distinguish *Witco* on other grounds as well. *Id.* In addition, Hercules asserts that "[i]t could not be clearer that this general language [of the notice letter] is insufficient to give the government an opportunity to act with regard to anything other than the sixty-eight discharge violations listed in the notice. . . . This general language is also inadequate to put Hercules on notice of the alleged violations so it could come into compliance and render the citizen suit unnecessary." *Id.* at 2–3 (citing *Hallstrom* and 40 C.F.R. § 135.3(a)).

■ One can think of a host of reasons why as a matter of policy and/or equity the sixty-day notice requirement should not be construed as strictly as the court construes it today. But the Supreme Court has made clear that this court is not free to disregard the notice requirements by exalting such considerations over the plain language of the statute and accompanying regulations. *See Hallstrom,* 493 U.S. at 31, 110 S.Ct. at 311. It is equally clear that except with respect to the sixty-eight discharge violations specifically listed therein, the one and only sixty-day notice letter filed by plaintiffs in this action does not satisfy the requirements of 40 C.F.R. § 135.3(a).

That notice did not make *any* mention whatsoever of monitoring, reporting, or recordkeeping violations. I am not persuaded by plaintiffs' argument that their mere mention of "effluent standard or limitation" in its sixty-day notice letter was sufficient to put defendant on notice that it also would eventually sue upon monitoring, reporting, and recordkeeping violations. Nor do I believe it was sufficient for plaintiffs to "warn" defendant that they would supplement their list of violations upon further reviewing Hercules' records. Such general notice as was given by plaintiffs' sixty-day letter does not satisfy the more specific, detailed requirements of 40 C.F.R. § 135.3(a), which were promulgated by the EPA pursuant to the authority vested in it by Congress in § 505(b)(1), 33 U.S.C. § 1365(b)(1).

Specifically, other than for the listed effluent limitation violations, the notice letter fails to "identify the *specific* standard, limitation or order alleged to have been violated"— which means the permit requirement which has been violated. The notice letter fails to identify "the activity alleged to constitute a violation"—such as failure to test or report or keep adequate records, for example. The notice letter was also deficient as to unlisted violations by not giving the "date or dates of such violation," all as required in 40 C.F.R. § 135.3(a). Each of these provisions is a component of statutory "notice of the alleged violation" as a prerequisite to suit under § 505(b)(1) of the Act.

That each of the violations alleged in the Complaint must have been stated in the sixty-day notice letter likewise is compelled by the statute's plain language, because § 505(b)(1) requires not just notice of an alleged violation, but "notice of *the* alleged violation." (Emphasis added.) Congress could not have chosen clearer language to express the requirement that the Complaint will be limited to the violations listed in the sixty-day notice letter. Complying with the

by failing to comply with NPDES/NJPDES permit number NJ 0005134 in at least the instances enumerated in the attached chronological list of permit violations.

The attached list is based on available permit records on file at the offices of EPA Region 2 in New York City. In some instances, information was missing from the public files. We therefore expect to request information from your records to bridge these data gaps and to supplement the list of violations based on that information. However, we do not believe that it is necessary to provide you with additional notice concerning any supplemental violations before filing a judicial enforcement action.

We intend, at the close of the 60–day notice period or shortly thereafter, to file a citizen suit under Section 505(a) of the Act against your company for the violations at the Gibbstown facility.

During the 60–day notice period, we would be willing to discuss a settlement of the claims in this letter. However, if you wish to pursue such negotiations in the absence of litigation, we suggest that you initiate those discussions within the next 10 days so that they may be completed before the end of the 60–day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

content requirements of 40 C.F.R. § 135.3(a) is just as important—and no less a statutory prerequisite to suit—as is the requirement of waiting sixty days after the giving of such notice before commencing suit. Section 1365 explicitly provides that "[n]otice under this subsection *shall* be given in such manner as the Administrator shall prescribe by regulation." 33 U.S.C. § 1365(b) (emphasis added).

Moreover, the Supreme Court, citing its decision in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), a Clean Water Act case, also cited a policy consideration militating in favor of strict construction. The Court cited legislative history as indicating "an intent to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom,* 493 U.S. at 29, 110 S.Ct. at 310 (citations to legislative history omitted). The Court explained that requiring citizens to comply with the notice and delay requirements serves this congressional goal in two ways. First, notice helps obviate the need for citizen suits by allowing Government agencies to take responsibility for enforcing environmental regulations. *Id.* (citing *Gwaltney,* 484 U.S. at 60, 108 S.Ct. at 382). Second, notice gives the alleged violator " 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.' " *Hallstrom,* 493 U.S. at 29, 110 S.Ct. at 310 (quoting *Gwaltney,* 484 U.S. at 60, 108 S.Ct. at 382).

A vague or open-ended notice, such as plaintiffs' notice at issue here, not only falls short of the statutory notice requirement, but it also fails to perform either of these two functions. Such notice does not help the EPA to assess intelligently whether to investigate or launch an enforcement action. Nor does it inform the violator of what it must do to avoid suit and bring itself into compliance.

It is true, as plaintiffs note, and as defendant acknowledges, that "the bulk of Hercules' testing and monitoring records were produced to plaintiffs on October 5, 1990 and

January 11, 1991[,]" after the plaintiffs filed their sixty-day letter. *See* Pl.Reply Br. at 5 n. 2; Def.Br. at 7 n. 20. Consequently, plaintiffs argue that "Congress could not have intended to require that the notice letter include violations about which plaintiffs had no knowledge, and could have had no knowledge, at the time the notice letter was written." Pl.Reply Br. at 5 n. 2. It may be true that Congress could not have expected plaintiffs to include such violations in their March 21, 1989 letter. But nothing prevented plaintiffs from complying with the Act's requirements and the clear mandate of *Hallstrom* by filing another notice letter including these newly discovered violations, and then waiting sixty days before filing another Complaint or even an Amended Complaint.

This result may seem counterproductive in light of the significant resources already invested in this case by all parties. But in *Hallstrom* the Supreme Court declined to allow the " 'absurd or futile results,' " *id.,* 493 U.S. at 29, 110 S.Ct. at 310 (quoting *United States v. American Trucking Assns., Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940)), which petitioners argued would be compelled by giving effect to the literal meaning of the notice provisions, to dictate the outcome. Petitioners in *Hallstrom* made two arguments. First, they asserted that "strictly enforcing the 60–day delay provision would give violators an opportunity to cause further damage or actually accomplish the objective that the citizen was attempting to stop." *Id.,* 493 U.S. at 30, 110 S.Ct. at 310–11. Similarly, they argued that the courts would thereby be precluded from giving essential injunctive relief until sixty days had elapsed. *Id.* The Court acknowledged this potential undesirable by-product of the sixty-day waiting period, but explained that the problem arises "as a result of the balance struck by Congress in developing the citizen suit provisions." *Id.* The Court further noted that Congress addressed the dangers of delay in certain circumstances (neither of which is applicable here) by making certain exceptions to the required notice periods.[10]

---

**10.** Section 1365(b) provides that a citizen suit

may be filed immediately after the citizen pro-

The *Hallstrom* petitioners also argued that a strict construction of the notice provision would cause "procedural anomalies." *Id.*, 493 U.S. at 30, 110 S.Ct. at 311. They asserted that if Government agencies explicitly declined to act after being notified of alleged violations, it would be pointless to require the citizen to wait sixty days before commencing its suit. *Id.* The Court stated that "[w]hile such a result may be frustrating to the plaintiff, it is not irrational[.] ... '[P]ermitting immediate suit ignores the possibility that a violator or agency may change its mind as the threat of suit becomes more imminent.'" *Id.* (quoting *Garcia v. Cecos Int'l, Inc.*, 761 F.2d 76, 82 (1st Cir.1985)).

In sum, there has never been a statutory notice letter in this case that alleged a specific monitoring, reporting, or recordkeeping violation, so all of the alleged monitoring, reporting, and recordkeeping violations must be dismissed. Similarly, all of the discharge violations which occurred before the filing of the Complaint on May 24, 1989 but which were not listed in the plaintiffs' sixty-day notice letter must be dismissed.

■ The court will *not* dismiss those discharge violations which occurred *after* the filing of the Complaint, however, even though they were not specifically alleged in the notice letter. I believe that this result is implicitly, if not explicitly, dictated by the Supreme Court's decision in *Gwaltney, supra,* and by the Act's anticipation of a continuing post-complaint violation(s) of the same type as alleged when the action was commenced.

In *Gwaltney,* the Court held that the Clean Water Act does not permit citizen suits for "wholly past violations." *Id.*, 484 U.S. at 60–61, 108 S.Ct. at 383. But, the Court further held, Section 505 of the Act does confer jurisdiction on the federal courts in citizen suits where either the defendant continues to violate its permit after the complaint has been filed *or* where the plaintiff

makes a good-faith allegation of continuing violations in the complaint. *Id.* at 64, 108 S.Ct. at 384. Moreover, "once such jurisdiction does attach, the court can assess penalties for all current *and* past violations of the Act, even if it is later proved that no violations actually occurred subsequent to the filing of the complaint." *PIRG v. New Jersey Expressway Authority,* 822 F.Supp. 174, 179 (D.N.J.1992) (Gerry, C.J.) (emphasis in original) (citing *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d 690, 696 (4th Cir.1989) (on remand from Supreme Court); *PIRG v. Carter–Wallace, Inc.,* 684 F.Supp. 115 (D.N.J.1988)).

As *Gwaltney* makes clear, subsequently occurring violations not noticed in a citizen's sixty-day letter were specifically contemplated—indeed required—by the Supreme Court as a prerequisite to a district court's jurisdiction over a citizen suit under the Clean Water Act. Such later-occurring violations therefore can be maintained notwithstanding their absence from the sixty-day letter, provided they are of the "type of activity" (*e.g.*, discharging pollutants in excess of permit limitations) as have been alleged in the notice letter. But those violations which in fact occurred before the complaint was filed on May 24, 1989 cannot be sued upon unless first noticed in compliance with 33 U.S.C. § 1365 and the accompanying regulations codified at 40 C.F.R. § 135.3.

■ The court is not unsympathetic to the amount of time and resources that the parties, as well as the court itself, have put into this case on violations which must be dismissed for lack of statutory notice. The court also recognizes that the plaintiffs might decide to file another letter noticing the violations dismissed by the court today, thereby obligating the parties and the court to revisit the parties' arguments concerning the merits of those particular allegations.[11] Such con-

vides the required notification when the notice alleges violations under 33 U.S.C. §§ 1316 and 1317(a). 33 U.S.C. § 1365(b). Neither of these exceptions applies to this case. *See National Environmental Foundation v. ABC Rail Corp., supra,* 926 F.2d at 1098.

11. I also recognize, though expressly do *not* rule today, that *Gwaltney*'s jurisdictional bar against

suits for "wholly past violations" might bar another suit by plaintiffs on the violations dismissed here. Even if today's dismissal of the presently alleged monitoring, reporting, and recordkeeping violations will forever preclude plaintiffs from seeking penalties therefor (a question which I again emphasize I am *not* deciding here), this

siderations of judicial economy, however, do not override the statutory notice requirements.[12] This court "must dismiss the action [with respect to those violations not noticed in plaintiffs' sixty-day letter other than post-Complaint effluent limitation violations] as barred by the terms of the statute." *Hallstrom*, 493 U.S. at 33, 110 S.Ct. at 312. *See also National Environmental Foundation v. ABC Rail Corp., supra*, 926 F.2d at 1097–1098; *Bettis v. Town of Ontario, N.Y.*, 800 F.Supp. 1113, 1118 (W.D.N.Y.1992).

Therefore, the court will grant summary judgment for defendant on all of the alleged violations not listed in plaintiffs' March 21, 1989 notice letter, *i.e.*, all of the alleged monitoring, reporting and recordkeeping violations whenever occurring, as well as on the alleged discharge violations which occurred before the Complaint was filed but which were not listed in plaintiffs' notice letter. The discharge violations which will be dismissed for improper notice are those numbered 1, 10, 12, 35, 37, 39–40, 43, 47–48, 52, 54–55, 59–60, 62–66, 68, 70–71, 79–86, 88, 91, 93–97, 99–102, and 104–105 on the chronological list of discharge violations attached to plaintiffs' September 14, 1992 letter to the undersigned.

In addition to arguing that it is entitled to summary judgment for those violations not properly noticed by plaintiffs, defendant contends that the court must dismiss many of the remaining violations as well for various reasons. I will address these reasons in turn, below.

### B. *Gwaltney's "On-going Violation" Requirement*

#### 1. Subject Matter Jurisdiction

■ Defendant argues that it is entitled to summary judgment as to those parameters [13] where violations are not continuing. Plaintiffs argue that this court's jurisdiction depends on defendant's violations of its permit generally and not provision by provision of its permit. They further assert that even if a parameter-by-parameter analysis were required, most of the violations challenged by defendant would not be barred.

Both parties rely primarily on the Supreme Court's opinion in *Gwaltney Of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), albeit on different interpretations thereof. As discussed, *supra*, *Gwaltney* held that the federal courts lack subject matter jurisdiction over citizen suits brought on the basis of wholly past violations. *Id.*, 484 U.S. at 60–61, 108 S.Ct. at 382–83. The Court further held, however, that it was sufficient for jurisdictional purposes if the citizen-plain-

consideration cannot override the explicit requirements of the Act.

**12.** The Supreme Court dismissed the suit in *Hallstrom* despite a much larger expenditure of judicial resources than has been incurred to date in the case at bar. In *Hallstrom*, the plaintiffs/petitioners commenced their suit one year after sending defendant/respondent, in April 1981, written notice of their intent to sue. Plaintiffs had not, however, sent notice of their intent to sue to either Oregon's Department of Environmental Quality ("DEQ") or the EPA. On March 1, 1983, respondent moved for summary judgment on the ground that petitioners had failed to satisfy the statutory requirement of providing notice to the DEQ and the EPA. Plaintiffs notified the agencies of their suit one day later on March 2, 1983.

The district court denied respondent's motion, reasoning that the petitioners' March 2nd notice cured any defect in the statutorily required notice. The district court further noted that the government agencies would then have sixty days in which to take appropriate steps if they so chose. Neither agency expressed any desire to take any action against respondent, and the district court concluded that dismissing the action at that stage "would waste judicial resources." *Hallstrom*, 493 U.S. at 24, 110 S.Ct. at 308. The case then proceeded to trial, and the court held that the respondent had violated RCRA.

On appeal, the Ninth Circuit concluded that the petitioners' failure to comply with the sixty-day notice requirement deprived the district court of subject matter jurisdiction. The Ninth Circuit remanded the action to the district court with instructions to dismiss. Notwithstanding the significant expenditure of judicial resources that had been involved to date, and the government agencies' clear disinterest in initiating proceedings against the respondent, the Supreme Court affirmed the Ninth Circuit's ruling.

**13.** A "parameter" is any pollutant (e.g., chromium, methylene chloride) or any water quality indicator (e.g., biochemical oxygen demand, TSS, pH) for which the permit contains one or more effluent limitations.

tiffs made good-faith allegations of ongoing violations.[14] *Id.* at 64, 108 S.Ct. at 384.

Hercules concedes that it has violated its permit on certain occasions since the filing of the Complaint in May, 1989. *See, e.g.,* Def. Br. at 61 (discharge excursion occurred in August 1990); Def. Sept. 15, 1992 Letter Brief at 2 n. 3 (violation at outfall 002 in December, 1989). But with respect to the question whether a court is to look at each parameter separately, or whether a court may exercise jurisdiction over all parameters based on an on-going violation of only one (or some) parameters, plaintiffs and defendant each cite various lower court cases interpreting *Gwaltney* and supporting the parties' respective positions. *See, e.g., Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.,* 719 F.Supp. 281, 287 (D.Del.1989) (rejecting parameter-by-parameter approach); *Sierra Club v. Port Townsend Paper Corp.,* 28 ERC 1676, 1678, 1988 WL 160580 (W.D.Wash.1988) (rejecting parameter-by-parameter approach); *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d at 697–98 (adopting parameter-by-parameter approach) (ruling on appeal from district court after case was remanded by Supreme Court); *Natural Resources Defense Council, Inc. v. Gould, Inc.,* 733 F.Supp. 8, 10 (D.Mass.1990) (noting its intent to conduct parameter-by-parameter analysis) (citing Fourth Circuit's opinion in *Chesapeake Bay v. Gwaltney,* 890 F.2d at 698). The Honorable Anne E. Thompson noted this conflict among the courts in her opinion upon motions for reconsideration of her previous decision in *PIRG v. Yates Industries, Inc.,* 757 F.Supp. 438 (D.N.J.1991). *See* Corrected Memorandum and Order, dated June 9, 1991, 790 F.Supp. 511, 515. Judge Thompson held on reconsideration:

> [E]vidence of violations in some parameters is admissible as evidence that future violations are likely in other parameters, thus satisfying the requirements of [the Supreme Court's decision in] *Gwaltney,* particularly where, as is the case here, numerous parameters have been violated on many occasions since the filing of the

suit. Evidence that defendant is generally not in compliance with the permit can convince the reasonable trier of fact that there is a continuing likelihood of recurring violations.

> Under the circumstances of this particular case, plaintiffs have established that there is a continuing likelihood that future violations may occur in any of the permit parameters that defendant has been found to have violated in the past. The court particularly notes that defendant has continued to violate both effluent limitations and reporting and monitoring requirements, leading the court to conclude that there is a continuing likelihood of discharge violations in general and of reporting and monitoring violations in general. Accordingly, upon reconsideration this court stands by its earlier decision which granted summary judgment to plaintiffs on various violations which defendant argued were wholly past.

*Id.,* 790 F.Supp. at 516.

I agree with Judge Thompson and hold that the court may exercise jurisdiction over all parameters based on an ongoing violation of any parameter, especially where multiple parameters have been violated in the past. In the present case, when the Complaint was filed plaintiffs properly alleged a pattern of ongoing violations of effluent limitations, and such violations continued post-complaint. Therefore, defendant's motion for summary judgment on this point will be denied.

### 2. Mootness

In addition to arguing that past violations must be dismissed for lack of jurisdiction, defendant asserts that plaintiffs' case is moot. Defendant contends that plaintiffs have confused the doctrines of original jurisdiction and mootness, and that even if the court declines to grant defendant summary judgment on the former ground, the court should grant it on the latter. The court, however, declines to accept this invitation.

---

**14.** As the Court noted, the "statute does not require that a defendant 'be in violation' of the Act at the commencement of suit; rather, the statute requires that a defendant be *'alleged* to be in violation.'" *Gwaltney,* 484 U.S. at 64, 108 S.Ct. at 385 (emphasis in original).

The mootness doctrine is well established in the Supreme Court's jurisprudence. *See, e.g., North Carolina v. Rice,* 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (per curiam) (citing cases). Mootness is a jurisdictional question derived from Article III of the Constitution, which explicitly restricts the exercise of judicial power to instances where a "case or controversy" exists. *Id.* at 246, 92 S.Ct. at 404. In *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Company,* 933 F.2d 124 (2d Cir.1991), the Second Circuit held that if there was no realistic prospect that the defendant will continue to violate the Clean Water Act, the case should be dismissed as moot. *Id.* at 128. *See also Atlantic States Legal Foundation, Inc. v. Pan American Tanning Corp.,* 807 F.Supp. 230 (N.D.N.Y.1992) (citing, *e.g., Eastman Kodak* ). The Fourth Circuit, however, noting that "the simple cessation of illegal activity upon the filing of a complaint does not moot a case[,]" *Chesapeake Bay Foundation,* 890 F.2d at 696 (citations omitted), has concluded that where there is proof of an ongoing violation, as that term is explained in the Supreme Court's *Gwaltney* decision,[15] a citizen suit under the Act "cannot become moot once there is assessment of civil penalties, so long as the penalties are for past violations that were part of or which contiguously preceded the ongoing violations[,]" *Chesapeake Bay Foundation,* 890 F.2d at 697.[16] Though the case *sub judice* is in a different procedural posture than was *Chesapeake Bay,* I believe, as did the Fourth Circuit, *id.* at 697, that the Supreme Court's dicta in *Gwaltney* on the mootness question supports the conclusion that this case is not moot.

In *Gwaltney,* the Supreme Court stated that:

Long-standing principles of mootness, however, prevent the maintenance of suit when there is no reasonable expectation that the wrong will be repeated. In seeking to have a case dismissed as moot, however, the defendant's burden is a heavy one. The defendant must demonstrate that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur. Mootness doctrine thus protects defendants from the maintenance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform.

*Id.,* 484 U.S. at 66–67, 108 S.Ct. at 386 (emphasis in original) (quotation marks and citations omitted).

Defendants have not met their "heavy burden" here. First, it must be emphasized that mootness must be judged here at the time the Complaint was filed, not at the time the court reaches the motion. This principle is dictated by *Gwaltney* 's holding that a violation is considered ongoing not only when a violation occurs after the filing of the complaint, but even where the plaintiff makes a good-faith allegation that violations are continuing, but in fact no post-complaint violation actually occurs. As previously mentioned, defendants have conceded that they committed violations after the filing of plaintiffs' Complaint. Second, it is not absolutely clear that such violations will not be repeated, even though the present proofs do not support permanent injunctive relief due to the lack of a likelihood of resumption of

---

**15.** The Fourth Circuit had previously instructed the district court that the plaintiffs could prove an ongoing violation

either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Chesapeake Bay Foundation,* 890 F.2d at 693 (quoting from 844 F.2d 170, 171–72 (4th Cir. 1988)).

**16.** The Court articulated the question before it as being "whether litigation over penalties imposed for past violations which are linked with ongoing violations presents a live case or controversy, even though primary subject matter jurisdiction is based on alleged continuing violations." 890 F.2d at 696. In the "[Court's] view, the penalty factor keeps the controversy alive between plaintiffs and defendants in a citizen suit, even though the defendant has come into compliance and even though the ultimate judicial remedy is the imposition of civil penalties assessed for past acts of pollution." *Id.*

harm, as discussed *infra.* Conceptually, the probability of recurrence of violations in this case lies somewhere between a *certainty* that *no* violations will recur and a *likelihood* that violations *will* recur.

Accordingly, the court will deny defendant's motion for summary judgment on the ground of mootness.

### C. *Duplicative Penalties*

■ Defendant vigorously argues that additional penalties should not be imposed for those violations already addressed by the DEP in the 1991 ACO. It states that it "is not seeking the dismissal of plaintiffs' claims as to the duplicate permit violations but instead asserts that plaintiffs cannot obtain penalties for the same permit violations for which Hercules has already paid penalties." Def.Br. at 16 n. 42. Stated differently, defendants are asking the court to find that "on the present record the assessed penalties, which were determined with plaintiff's input,[17] are more than adequate." Letter dated January 16, 1992, from Joel Schneider, Esq., to the Honorable Stanley S. Brotman, before whom this motion was previously filed.

Plaintiffs retort that they are not seeking "double penalties." They assume this court will take the penalties previously imposed into account when, and if, the court reaches the issue of penalties. In essence, plaintiffs are arguing that no bar exists to prevent this court from imposing additional penalties for these violations, if the court should deem such additional penalties warranted by the circumstances of this case.

Sections 505(b) and 309(g) of the Act specify the circumstances under which citizen suits are precluded. Section 505(b)(1)(B) provides that a citizen suit cannot be brought if a "state has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State" against the violator. 33 U.S.C. § 1365(b)(1)(B). Since neither the NJDEPE nor, for that matter, any other agency, has commenced a civil or criminal court action against Hercules, § 505(b)(1)(B) is not applicable here.

State-instituted civil penalty actions are addressed in Section 309(g)(6)(A), which provides in relevant part:

[A]ny violation ... for which ... the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such *comparable* State law, as the case may be, shall not be the subject of a civil penalty action under [§ 505 of this Act].

33 U.S.C. § 1319(g)(6)(A) (emphasis added). Section 309(g)(6)(B)(ii) provides in relevant part:

The limitations contained in subparagraph (A) on civil penalty actions ... shall *not* apply with respect to any violations for which ... notice of an alleged violation of section [505(a)(1) of this Act] has been given in accordance with section [505(b)(1)(A) of this Act] prior to commencement of an action under this subsection and an action under section [505(a)(1) of this Act] with respect to such alleged violations is filed before the 120th day after the date on which such notice is given.

33 U.S.C. § 1319(g)(6)(B)(ii) (emphasis added).

In *PIRG v. Yates Industries, Inc., supra,* 757 F.Supp. 438, Judge Thompson denied defendant's motion to dismiss duplicative violations also raised in an administrative action initiated by the DEP.[18] The court stated that "defendant's equity arguments are not

---

**17.** The parties dispute the extent to which the plaintiffs participated in the settlement negotiations which culminated in the ACO and whether this participation precludes plaintiffs from bringing this suit. This dispute is not relevant to the court's determination of the larger issue here discussed, *i.e.,* whether additional penalties can be imposed. At trial, the court will hear testimony regarding the extent of plaintiffs' input and will determine what, if any, impact such input should have on this court's penalty assessment.

**18.** In *Yates,* plaintiffs filed their complaint on December 26, 1989, having previously given the required sixty-days notice. The DEP issued a separate Administrative Order and Notice of Civil Administrative Penalty Assessment on December 21, 1989, imposing $2,633,000.00 in civil penalties. *Yates,* 757 F.Supp. at 442.

useful, insofar as section [309(g)(6)(B) ] is rather clear on its face as to when and how it applies." *Id.* at 445 (quoting from transcript of prior proceedings in that case).

The *Yates* court, however, did dismiss two claims which the DEP previously had considered and upon which it "explicitly declined to act." *Id.* at 452. The court stated:

> [T]he DEP explicitly considered the allegations, and decided not to impose sanctions. 'If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.' *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation,* 484 U.S. 49, 61 [108 S.Ct. 376, 383, 98 L.Ed.2d 306] (1987).

*Yates* at 453. The defendant latches on to this language in making its argument here. Plaintiffs, of course, direct our attention to the *Yates* court's previously discussed refusal to dismiss other duplicative violations.

The court in *PIRG v. GAF Corp.,* 770 F.Supp. 943 (D.N.J.1990), faced a situation similar to the one here. In *GAF*, the defendant entered into an ACO with the DEP prior to the filing of the citizen-plaintiffs' complaint [19] but after the sixty-day notice

letter was issued.[20] *Id.,* at 945. In the instant case, the ACO was not signed until almost two years after plaintiffs filed their complaint. But the DEP first issued its Notice of Civil Penalty Assessment, which ultimately resulted in the signing of the ACO, on May 5, 1989, after plaintiffs issued their sixty-day notice and nineteen days before plaintiffs filed their Complaint. The *GAF* court held that since the state proceeding did not fall within any of the provisions of § 309(g)(6) of the Act, the suit was not barred.[21] *See also PIRG v. New Jersey Expressway Authority, supra,* 822 F.Supp. at 183–84. I likewise find §.309(g)(6) inapplicable here.[22]

As discussed above, Hercules does not argue that these duplicative motions must be dismissed.[23] Rather, it argues that this court should not as a matter of equity impose fines for violations for which the DEPE has already penalized it, or, in the alternative, that the court should find as a matter of law that the penalties already imposed and the non-monetary concessions already granted by Hercules are adequate. The court today concludes that plaintiffs are not barred from seeking imposition of additional penalties beyond those already assessed against Hercules by the NJDEPE. I emphasize, however,

---

**19.** Ironically, the complaint in *GAF* was filed on the same day as the complaint in the case at bar, May 24, 1989. *See GAF,* 770 F.Supp. at 944–45.

**20.** Under the ACO, the NJDEPE accepted a penalty settlement of $227,000 from GAF. *See PIRG v. GAF Corp.,* 770 F.Supp. 943, 948 (D.N.J.1990).

**21.** Defendant cites us to Judge Ackerman's statement that:

> If government has already assessed those violations and determined to assess a certain amount of penalties under the Clean Water Act or a comparable state law, there is no reason to step on the agency's shoes and impose an additional penalty which the agency chose to forego.

*GAF* at 950. But Judge Ackerman continued on to state in the very next sentence: "I find, however, that the state administrative action that was brought against GAF by the DEP was not 'comparable' to the Clean Water Act, within the meaning of Section 309." *GAF* at 951. The state administrative action and the ACO ultimately issued by the DEP in *GAF* were covered by the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A–1, *et seq. GAF* at 950–52. The DEP

actions taken against Hercules in this case also were brought under the New Jersey Water Pollution Control Act. *See* DEP notice, Def.Ex. 12, p. 1.

**22.** Hercules had entered into and complied with four settlements with the EPA and NJDEPE before the court assessed the maximum penalty against this defendant in a prior case, *SPIRG v. Hercules, Inc., supra,* note 5. None of those settlements involved monetary penalties. But, plaintiffs argue, the fact that the court assessed penalties notwithstanding the administrative settlements is additional evidence that prior administrative settlements do not preclude this court from assessing additional penalties if it deems them warranted. Whether DEPE assessed no penalties or $600,000 in penalties, as is the case here, does not alter the logic of this analysis. *See* Plaintiff's Brief in Opposition to Hercules, Inc.'s Supplemental Brief Regarding New Factual and Legal Developments at 21–22.

**23.** *See also* Defendant's September 15, 1992 Letter Brief at 4 ("Hercules has also never argued that plaintiffs' action is barred under 33 U.S.C. § 1319(g)(6) …").

that I am not today deciding whether the court will in fact impose additional penalties for those violations already addressed by the NJDEPE in the March, 1991 ACO. The court reserves that decision until trial.

### D. *Discharge Violations*

Of the one hundred fourteen (114) discharge violations listed by plaintiffs (including the ones which the court has decided to dismiss for lack of proper notice), all but one have previously been addressed by the NJDEPE in the March, 1991 ACO. Though as discussed above defendant argues that it should not be assessed additional penalties on top of those already imposed, it disputes only a relatively few on the merits. The only violation not previously addressed was an alleged June 1986 discharge excursion involving TSS, which is listed as violation no. 10 on the chronological list of discharge violations attached to plaintiffs' September 14, 1992 letter ("Pl. 9/14/92 Attachment"). Defendant argues that this specific discharge was not in fact a violation and that it is entitled to summary judgment therefor. Because we have already decided to grant defendant summary judgment on violation no. 10 on other grounds, *i.e.*, absence of notice of pre-Complaint discharge violations, we need not address the parties' arguments as to the merits of whether this June 1986 incident actually constituted a violation of Hercules' permit.

Defendant also argues that summary judgment must be denied to plaintiffs, and granted to defendant, on those allegations for which a viable "upset" defense exists. The requirements for establishing an upset defense are set forth in Hercules' permit, Def. Ex. 2, pp B–3, 4, and described in N.J.A.C. 7:14A–3.10 and 40 C.F.R. § 122.41(n). An "upset" is defined in the federal regulations as:

[A]n exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities,

inadequate treatment facilities, lack of preventive maintenance or careless or improper operation.

40 C.F.R. § 122.41(n). The U.S. Court of Appeals for the D.C.Circuit has described the reason for establishing the upset defense as follows:

Lacking infallibility, no pollution control technology works perfectly all of the time. Occasionally through no fault of the operator, the technology will fail, and pollution levels in the effluent will correspondingly rise. Current EPA regulations provide that when permit effluent limitations based on technological capabilities are briefly exceeded as the result of such an incident, the offending plant will nevertheless be deemed to be in compliance with the Act. This is the so-called "upset defense." (Footnotes omitted).

*Natural Resources Defense Council v. U.S.E.P.A.*, 859 F.2d 156, 206 (D.C.Cir.1988). Defendant states that triable issues of fact exist as to whether it is entitled to the upset defense for certain alleged violations.

Defendant contends that three separate upsets occurred.[24] It states that violation Nos. 42–47, Pl. 9/14/92 Attachment, resulted when seven electrical failures combined with unusual heavy rainfall to cause an overflow of the Dicup skimmer pit. Violation nos. 43 and 47 were not listed in plaintiffs' notice letter. The same storm event allegedly also caused a temporary 150% increase in process water flows to the plant. Defendant states that the unanticipated electrical failures in the oil/water separation systems reduced the oil/removal efficiency. Hercules further notes that it notified the NJDEPE of all violations related to this upset within twenty-four (24) hours of Hercule's knowledge of the event. Such notice is a requisite element of an upset defense. Without such notice, an "upset defense is defective as a matter of law ... on this ground alone." *SPIRG v. P.D. Oil & Chemical Storage, Inc.*, 627 F.Supp. 1074, 1087 (D.N.J.1986). *See also NJPIRG v. United States Metals Refining Co.*, 681 F.Supp. 237, 242–44 (D.N.J. 1987). Most importantly, defendant points

---

**24.** *See* Affidavit of Douglas Cox, annexed as Def. Ex. 8; Def.Br. at 51–58; Def.Reply Br. at 18–20.

out that with respect to alleged violation Nos. 42–47, the NJDEP has already accepted this defense. *See* Def.Ex. 42 ("NJDEP determined the violations for Total Phenols, COD, and BOD in July 1988 and BOD in August 1988 to be the result of upsets caused by flood and electrical failure. Consequently, NJDEP is not assessing a penalty for these violations."). Defendant seeks summary judgment on Nos. 42–47.

We concur with the assessment of the NJDEPE that the circumstances which resulted in these violations qualify as an upset. Therefore, the court will grant defendant's motion for summary judgment with respect to discharge violation nos. 42–47. Defendant is also entitled to summary judgment for violation nos. 43 and 47 in any event because they were not noticed by plaintiffs.

■ Defendant contends that violations Nos. 50–59 and 62–65, Pl. 9/14/92 Attachment, were caused by the unanticipated failure of a blower and the replacement blower that was put into service. Of these, nos. 52, 54–55, 59, and 62–65 were not listed in plaintiffs' sixty-day notice. Again, Hercules states that except with respect to one of these violations (no. 64), it notified the NJDEPE within twenty-four hours of Hercules's knowledge of the event. Because the court finds that genuine issues of material fact exist concerning whether these violations really constitute exceptional incidents qualifying as an upset, the court will deny both parties' motions for summary judgment on discharge violation nos. 50–51, 53, and 56–58. Because they were not properly noticed, the defendant is entitled to summary judgment on nos. 52, 54–55, 59, and 62–65.

■ As for violations Nos. 68, 71, 73–74, 78–86, 88 and 93, Pl. 9/14/92 Attachment, defendant contends that they were caused by scheduled maintenance work on a clarifier and related problems. Of these, nos. 68, 71, 79–86, 88, and 93 were not listed by plaintiffs in their notice letter. Defendant states that it reported all but three of these violations to the NJDEPE within twenty-four hours of its awareness of the violation. At the very least, defendant argues, it has raised a triable issue

of fact with respect to these alleged violations, and that the court should not grant plaintiffs summary judgment on them. Plaintiffs, on the other hand, again contend that this problem does not qualify as an exceptional incident. They also assert that defendant did not provide the required notice for each of these violations.

The court finds that these violations are more appropriately attributed to operational error or, at the very least, to circumstances that were within the defendant's control. The court therefore will deny defendant's motion for summary judgment on the basis of an upset defense regarding this set of violations and grant summary judgment for plaintiffs on nos. 73–74 and 78. The court will grant defendant summary judgment on nos. 68, 71, 79–86, 88, and 93 because of their absence from plaintiffs' notice letter.

As to all other violations for which summary judgment was not granted to defendant or denied to both parties,[25] summary judgment will be granted to plaintiffs.

## II. *Injunctive Relief*

■ Plaintiffs have moved for a permanent injunction pursuant to 33 U.S.C. § 1365(a) prohibiting Hercules from operating its facility in violation of its NPDES/ NJPDES permit and, therefore, the Act. The proposed injunction would also require defendant to provide plaintiffs with its DMR's and the underlying data, to enable plaintiffs to monitor defendant's compliance with the injunction.

Plaintiffs assert that "the types of pollutants which defendant has discharged in excess of its permit limits have been specifically recognized as harmful to public health and aquatic life by the U.S. Environmental Protection Agency. Defendant has violated discharge limitations for TSS, BOD, COD, phenols, TRC, fecal coliform, oil and grease pH, TDS, color, and bioassay." Pl.Br. at 37. This court agrees that plaintiffs have proved defendant's violations of discharge limitations in the past, as found elsewhere in this Opinion, and as to which plaintiffs are obtaining partial summary judgment as to liability.

25. Summary judgment was denied to both parties on violation nos. 50–51, 53 and 56–58.

Those findings are incorporated herein by reference. Each of these violations evidences a past harm to the environment and will be the subject of potential penalties, as discussed elsewhere, at a future hearing.

Plaintiffs also seek injunctive relief based upon defendant's alleged monitoring, reporting and recordkeeping violations, which are said to "also cause irreparable injury to the environment by seriously undermining effective enforcement of the Act." Pl.Br. at 44. They argue that "based on defendant's longstanding and continuing history of noncompliance, such an order is required." Pl.Br. at 50. They also assert that the "only foreseeable harm [to defendant] from issuance of an injunction compelling defendant to comply with its permit is economic harm to defendant." *Id.* at 47. The economic harm of injunctive relief is alleged to be clearly outweighed by the injury to plaintiffs and the public if an injunction is denied. *Id.*

Defendant argues that an injunction is not warranted because Hercules "is and will be in strict compliance with its permit."[26] Def. Br. at 63. It notes that as of June 25, 1992, it "has satisfied all the terms of the [March, 1991] ACO." Def.Ex. 59. Moreover, defendant states that there has not been a discharge excursion at Gibbstown since August 9, 1990. *Id.* at 61; Def.Sur. Reply at 9. *See also* Pl.Revised Ex. 8; Pl. 9/14/92 Attachment. Defendant further notes that since its previous violations it has built and operated a new wastewater treatment facility and states that its new plant is substantially oversized for its current loadings. *See* Defendant's Letter in Response to Plaintiffs' August 6, 1992 Letter at 3. Defendant also points to plaintiffs' admission that Hercules' new plant and equipment is adequate to "treat defendant's discharge to levels necessary for permit compliance...."[27] Plaintiff's Brief in Opposition to Defendant's Supplemental Brief Regarding New Factual and Legal Developments at 6 n. 3.

The defendant has also submitted evidence that the NJDEPE has recently completed its "Compliance Evaluation Inspection" regarding the September 28, 1992 inspection of the Gibbstown plant. Letter of Joel Schneider, October 12, 1992. Defendant received a rating of "Acceptable," which is the highest possible rating, the others being Conditionally Acceptable and Unacceptable. *Id.* A copy of the NJDEPE Compliance Evaluation Inspection letter (attaching the "Discharge Surveillance Report" dated September 30, 1992) verifies these claims of full NJDEPE permit compliance at the Gibbstown Plant.

Defendant also submitted evidence of an Administrative Order and Notice of Civil Administrative Penalty Assessment (dated September 10, 1992), which assessed a $600 penalty. Defendant's Quality Supervisor, John Ziegler, forwarded Defendant's payment on October 8, 1992, and reported that the violations had been cured by calibrating the pH meters and performing the replicate sample analysis of pH and chlorine residual in accordance with the provisions of N.J.A.C. 7:18–4.7(e)(3) & 4.7(e)(11)(i), respectively. See Letter of John Ziegler to NJDEPE (dated October 8, 1992), attached to Letter of Joel Schneider, *supra*. There is no evidence that these calibration and testing problems somehow concealed actual discharges exceeding effluent limitations.

With respect to outfall 002, defendant notes that on June 28, 1991, it entered into an ACO with the NJDEP regarding this outfall.[28] Def.Ex. 56. Hercules states that there still is no current discharge to Clonmell

---

**26.** Defendant relies in part on the affidavit of Walter D. Leavy, the person in charge of running the Gibbstown plant. Def.Ex. 6.

**27.** In making this admission, plaintiffs argue that the issue is not the adequacy of the plant, but "defendant's commitment to operating the wastewater treatment plant properly." Pl.Opp. to Def.Supp.Brief Regarding New Factual and Legal Devs. at 6 n. 3.

**28.** Defendant notes as particularly relevant the NJDEP's "unsolicited" comment to Hercules that "Your continued cooperation in assisting NJDEP in the prevention and control of water pollution in New Jersey is appreciated." Def.Ex. 56. This same language is repeated in a June 25, 1992 letter from the NJDEPE to defendant in which the NJDEPE acknowledges defendant's full and complete compliance with the terms of the March, 1991 ACO. Def.Ex. 59.

Creek because the outfall is blocked.[29] Defendant's Supplemental Brief Regarding New Factual and Legal Developments at 1. Pursuant to the terms of this ACO, Hercules is barred from discharging to Clonmell Creek unless and until the NJDEPE provides written approval. Def.Ex. 56 at ¶ 17. *See also* Defendant's September 15, 1992 Letter Brief at 2 n. 3.

In their August 6, 1992 Letter Brief, and their Opposition to Hercules, Inc.'s Supplemental Brief Regarding New Factual and Legal Developments in Support of Its Cross-Motion for Summary Judgment, filed on September 3, 1992, plaintiffs alleged a total of 26 additional monitoring violations which they did not include in their original submissions. These included alleged monitoring violations such as exceeding holding times for samples or taking several "grab" samples rather than composite samples of influent; these "new" monitoring violations occurred between November 1990 and June 1991. In a letter dated September 14, 1992, plaintiffs state that they erroneously alleged 12 of these 26 violations. They now therefore allege that defendant has committed an additional 14 monitoring violations during the time through June 1991. Defendant denies that it committed any of these alleged additional violations. *See* Defendant's September 10, 1992 Letter Brief. Defendant points out, for example, that it has taken only composite samples of influent since July 1, 1991, consistent with plaintiffs' interpretation of this sampling requirement. *Id.* at 3. Defendant also argues that the court should not grant an injunction based upon monitoring or reporting violations. *Id. See also PIRG v. Yates Industries, Inc., supra,* 757 F.Supp. 438 (D.N.J.1991) (denying injunction based upon monitoring and reporting violations).

The above facts must be analyzed under the prevailing standard for granting permanent injunctive relief. This court may grant permanent injunctive relief under the Clean Water Act, 33 U.S.C. § 1365(a), when the plaintiffs make "a showing both of irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest." *NRDC v. Texaco Refining and Marketing, Inc.,* 906 F.2d 934, 941 (3d Cir.1990) (citing *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 544–47, 107 S.Ct. 1396, 1403–05, 94 L.Ed.2d 542 (1987)).

Upon the present record, plaintiffs have failed to show a sufficient likelihood that statutory violations will recur and give rise to irreparable injury. The mere fact of past statutory violations is insufficient to meet the burden of irreparable harm. *Id.* at 941. Plaintiffs have not shown that the environmental injury arising from the defendant's discharges that exceeded the permit's discharge limitations, often by a small factor, none of which has occurred since August, 1990, is of permanent or at least long duration, *see Amoco, supra,* 480 U.S. at 545, 107 S.Ct. at 1404. Upon the present record, we also cannot conclude that it is "sufficiently likely" that the harm caused by past discharge excursions will be repeated. *NRDC v. Texaco, supra,* 906 F.2d at 941, (quoting *Amoco, supra,* 480 U.S. at 545, 107 S.Ct. at 1404). This court recognizes that it has the duty "to beware of efforts to defeat injunctive relief by protections of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption." *United States v. Oregon Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1951). On the present record, plaintiffs have not demonstrated that defendant's "protestations of repentance" are insincere or unfounded in facts, nor have plaintiffs demonstrated that violations of effluent limitations are likely to resume despite the 31–month hiatus of such violations since August, 1990.

Instead, defendant has taken continuing and successful measures to assure that such harm does not recur. These measures include full compliance with the March, 1991 ACO, and the construction and successful operation of a new wastewater treatment facility. Further measures have been taken, as noted above, to assure continued compliance at outfall 002 under the June, 1991

---

**29.** Defendant states that it has not committed any violations at this outfall since December, 1989, and plaintiffs do not dispute this claim.

*See* Defendant's September 15, 1992 Letter Brief at 2 n. 3.

ACO, under which there is no current discharge to Clonmell Creek. Because no discharge at outfall 002 will occur in the future without NJDEPE approval, and in light of the fact that there has been no permit excursions at outfall 002 since 1989, the recurrence of such harm at outfall 002 remains doubtful.

The court also finds that the continuing trickle of alleged monitoring violations, the last of which occurred in June, 1991 (21 months ago) is insufficient to trigger permanent injunctive relief. Although such recordkeeping or monitoring violations may occur on a sporadic basis, in light of the sheer statistical certainty of some sort of error as time goes by, this prospect of such recurrence of recordkeeping and monitoring violations is not sufficiently great, nor are the consequences of such sporadic and unintended mistakes so grave in terms of causing harm to the environment, that the need for permanent injunctive relief is shown upon this record. Therefore, plaintiffs' motion for permanent injunctive relief will be denied without prejudice to another application based upon future violations.

### III. *Defendant's Motion in Limine to Bar Evidence Regarding Hercules' Kenvil Facility*

 The case *sub judice* concerns only Hercules' permit compliance record at its Gibbstown, New Jersey facility from March 1985 to the present. Plaintiffs contend that if this court does in the end award duplicate penalties, it should take into consideration actions at another, completely unrelated facility, *i.e.*, Hercules' facility at Kenvil, Morris County, New Jersey. Hercules argues in this motion in limine that evidence regarding its past permit compliance at Kenvil is irrelevant and should be barred from the case. Defendant further argues that even if its violations at the Kenvil facility are relevant,

evidence concerning those violations should be barred under Fed.R.Evid. 403.

Defendant committed 168 permit violations at its Kenvil facility between 1977 and 1984. Plaintiffs brought suit against defendant in 1983 based upon these violations. The court granted plaintiffs' motion for partial summary judgment in *SPIRG v. Hercules, Inc.,* 23 ERC 2081, 1986 WL 6380 (D.N.J.1986), and subsequently imposed the statutory maximum penalty of $1.68 million in *SPIRG v. Hercules, Inc.,* 29 ERC 1417, 1989 WL 159629 (D.N.J.1989). The court found that Hercules was responsible for "a long siege of environmental vandalism and a record of unsatisfactory responses to repeated EPA and DEP complaints and orders to show cause." *Id.* at 1422, 1989 WL 159629.

Defendant argues that evidence of the Kenvil violations should be excluded because Douglas Cox, the plant manager at Gibbstown from May, 1984 through May, 1991, and the individual "ultimately responsible" for permit compliance at Gibbstown, "never worked at Kenvil and was not responsible for permit compliance at that site." Defendant's Brief in Support of Its Motion In Limine at 3 (hereinafter, "Def.Br."). Defendant also states that different individuals are responsible for implementing environmental policy at each facility. *Id.* It further notes a lack of evidence that any of the Gibbstown plant personnel had any connection with the Kenvil site. *Id.*

Plaintiffs point out that defendant continued to violate its permit at the Gibbstown facility [30] after the plaintiffs filed their suit regarding the Kenvil facility, after summary judgment was granted, and even after the court imposed substantial penalties.[31] Plaintiffs state that these violations at Gibbstown represent Hercules' lack of good faith.

Congress explicitly provided that a polluter's history of violations and good-faith efforts to comply with its permit are relevant

---

**30.** This contention is the subject of the cross-motions for summary judgment discussed above.

**31.** Plaintiffs also dispute defendant's contention that its Kenvil and Gibbstown facilities were completely independent. They cite the deposition testimony of Douglas Cox, the Gibbstown plant manager, and of Bruce Hough, an environ-

mental engineer employed by Hercules, as evidence that Hercules's Gibbstown personnel were aware, or at least should have been aware, of the Kenvil violations and the related penalties. *See* Plaintiffs' Brief in Opposition to Defendant's Motion in Limine (hereinafter, "Pl.Br.") at 4–5.

to the amount of civil penalties, if any, a court should assess against a polluter. Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), provides:

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, *any history of such violations, any good-faith efforts to comply with the applicable requirements,* the economic impact of the penalty on the violator, and such other matters as justice may require. (Emphasis added).

And in *Tull v. United States,* 481 U.S. 412, 422, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987), the Supreme Court stated:

> The legislative history of the [Water] Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution when it imposed civil penalties.

Plaintiffs argue that evidence of the Kenvil violations supports their contention that a substantially larger penalty is needed in this case in order to deter defendant from committing further violations, and is therefore relevant.[32]

Plaintiffs further argue that this evidence should not be barred under Rule 403, Fed. R.Evid. Pl.Br. at 4. They state that the evidence they intend to present will not be overly time-consuming or burdensome. They note that all of the evidence they intend to present as to Hercules' Kenvil violations has already been reviewed and adjudicated by the court. Hercules thus would be collaterally estopped from challenging those violations.

The court agrees with plaintiffs' argument that as a general matter the Hercules violations at another facility in this state are relevant to the history of defendant's past violations for determining the amount of civil penalty under 33 U.S.C. § 1319(d). The "history of violations" by defendant easily includes these adjudicated Kenvil violations. To preclude such evidence during the penalty phase would be to exclude probative information about Hercules' recent history of Clean Water Act violations. The Rule 403 factors that would give rise to undue prejudice are not present here: because these historical violations have been adjudicated, there will not be time consumed here by adjudication of collateral matters, nor is testimony apparently even necessary to supplement the written record. The fact these violations occurred at another plant does not render them less probative where the types of Clean Water Act violations appear to be similar to the present case. The penalties imposed at Kenvil are also relevant to the issue of deterrence under *Tull, supra,* and more particularly to assessing the marginal deterrent value of any civil penalty to be imposed in the present case. Accordingly, defendant's motion in limine to bar the record of defendant's past permit compliance at Kenvil will be denied. The court retains the right at trial to curtail unnecessary proofs, especially if the unwarranted consumption of time would occur due to these Kenvil proofs.

## IV. *Defendant's Motion in Limine to Bar Certain Proposed Trial Testimony Regarding the Application of the DEPE and the EPA Civil Penalty Policies*

In order to rebut defendant's argument that the $600,000 penalty the NJDEPE assessed against it was adequate, plaintiffs intend to present testimony concerning the EPA's penalty policies and the DEPE's penalty matrix. Plaintiffs argue that the $600,000 penalty actually assessed against the defendant was significantly lower than is called for by the EPA's and DEPE's own criteria. Plaintiffs have prepared exhibits showing their calculations of the "appropriate" penalty under these policies. These exhibits were prepared by Michael O'Donnell, a paralegal in the office of plaintiffs' counsel. Defendant now seeks to bar Mr. O'Donnell's testimony.

Defendant makes several arguments as to why this testimony should be barred. First,

---

**32.** Plaintiffs also cite the EPA's "A Framework for Statute–Specific Approaches to Penalty Assessments," attached to its 1984 Penalty Policy, annexed as Ex. A to Pl.Br., as further support for the relevancy of the Kenvil violations. *See* Pl.Br. at 3.

it argues that O'Donnell's proposed testimony is not relevant. Defendant's Brief in Support of Its Motion in Limine at 2 (hereinafter, "Def.Br."). Second, defendant argues that O'Donnell is not qualified to testify about the application of the EPA and NJDEPE penalty policies. *Id.* at 2–3, 6–7. Third, it argues that O'Donnell's testimony regarding the application of the DEPE's penalty analysis is repetitive and unnecessary. *Id.* at 3. Fourth, defendant argues that O'Donnell's proposed testimony would be misleading. *Id.* at 6–8.

In response, plaintiffs point out that several courts have referred to these policies as a helpful framework for arriving at appropriate civil penalties under the Water Act. Although the court is not bound by either the EPA's or NJDEPE's standards, *see* Def.Br. at 4–5, plaintiffs state that these agencies' policies will assist the court in arriving at an appropriate penalty, as well as demonstrate that the $600,000 penalty previously assessed by the DEPE was inadequate. They do not argue that the court should automatically assess the penalty resulting from the mechanical application of the DEPE's penalty matrix.

Plaintiffs also note that Mr. O'Donnell is not being offered as an expert witness. Rather, they simply wish to have him testify as to his preparation of the grid matrix exhibits plaintiffs intend to present. He therefore does not need to possess any "special qualifications which permit him to testify as to the application of the NJDEPE and EPA penalty policies to Hercules' particular circumstances." Pl.Br. at 17, quoting from Def. Br. at 2. Moreover, plaintiffs argue that Mr. O'Donnell's testimony is not even necessary for the admission of these exhibits.[33] Pl.Br. at 18 (citing Fed.R.Evid. 1006). Plaintiffs offer Mr. O'Donnell's testimony to assist the court in understanding the exhibits he prepared.

With the understanding that Mr. O'Donnell's testimony will be limited to his explaining of the exhibits, and not to the actual operation of the EPA's or NJDEPE's penalty policies, and further that he is offering no expert testimony, Mr. O'Donnell will be permitted to testify. Defendant's motion in limine will be denied.

## V. *Plaintiffs' Appeal of Magistrate Judge Rosen's March 11, 1992 Order*

In preparing the exhibits discussed above, Mr. O'Donnell relied in part on a memorandum prepared by a former paralegal assistant named David Harrison in the office of plaintiffs' counsel. Defendant sought to discover that memorandum, and plaintiffs objected, arguing that it was protected work-product. After having reviewed the letter submissions of counsel and having conducted an *in camera* inspection of the memorandum at issue, Judge Rosen convened an oral argument by telephone on March 11, 1992 pursuant to General Rule 15 E.2. Judge Rosen ruled that the memorandum was not work product and that defendant in any event had demonstrated a special need for the memorandum, and he ordered plaintiffs to produce it within ten days. Judge Rosen denied plaintiffs' request for reconsideration of his Order, and on March 24, 1992 Judge Rosen entered an Order temporarily staying his disclosure order pursuant to General Rule 40 D.4(b).

Plaintiffs seek review of Judge Rosen's determination pursuant to 28 U.S.C. § 636(b)(1)(A), Fed.R.Civ.P. 72(a) and General Rule 40 D.4(a), under which a Magistrate Judge's order upon a non-dispositive motion can only be set aside if found to be "clearly erroneous or contrary to law." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1113 (3d Cir.1986), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). Particularly in discovery motions, a Magistrate Judge's Order is entitled to great deference in this District, since the Magistrate Judges have full authority to manage the civil cases and to determine all such matters of discovery and case management under General Rules 15 & 40 A. *Republic of Philippines v. Westinghouse Elec. Corp.,* 132 F.R.D. 384, 386–87

---

**33.** These exhibits are attached as Exhibit 3 to Plaintiffs' Brief in Support of Plaintiffs' Notice of Appeal of Magistrate Judge Rosen's Order of March 11, 1992.

(D.N.J.1990); *Schroeder v. Boeing Commercial Airplane Co.,* 123 F.R.D. 166, 169 (D.N.J.1988); *Environmental Tectonics v. W.S. Kirkpatrick & Co.,* 659 F.Supp. 1381, 1399 (D.N.J.1987), *modified on other grounds,* 847 F.2d 1052 (3d Cir.1988), *aff'd,* 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). This deference is also especially appropriate where the Magistrate Judge has managed this case from the outset and developed a thorough knowledge of the proceedings.

Plaintiffs argue that the Harrison Memorandum is protected from discovery due to the work product protection of Rule 26(b)(3), Fed.R.Civ.P., which protects otherwise discoverable documents that are

> prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent).

Rule 26(b)(3) is especially protective of the disclosure of opposing counsel's legal analysis or mental processes, *see Sporck v. Peil,* 759 F.2d 312 (3d Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). Two primary purposes of the work product doctrine are to avoid the prospect of converting the adverse attorney "from advocate to witness" and to avoid probing the adversary's file for information available from other sources. *United States v. Amerada Hess Corp.,* 619 F.2d 980, 987 (3d Cir.1980) (quoting in part *In re Grand Jury Investigation (Sun Co.),* 599 F.2d 1224, 1228 (3d Cir.1979)).

A showing that a document is work product may be overcome "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Rule 26(b)(3), Fed.R.Civ.P. The rule further requires that "[i]n ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representa-

tive of a party concerning the litigation." Rule 26(b)(3).

■ Plaintiffs, as the parties seeking the protection of Rule 26(b)(3), bear the burden of establishing that the Harrison Memorandum is work product,[34] at which time the burden shifts to defendant to show substantial need and inability to obtain the substantial equivalent without undue hardship.

■ Plaintiffs state that the memorandum was prepared in anticipation of litigation. The memorandum itself states that it was prepared in order to "describe various types of [permit] violations and the procedure for finding them." Pl.Ex. 6. Plaintiffs note that finding permit violations is a prerequisite to bringing litigation under the Clean Water Act. They argue that since the memorandum was prepared as a guide to finding permit violations, it was prepared in anticipation of litigation.

Plaintiffs also contend that the memorandum is "opinion" work product, not merely ordinary or "fact" work product. They assert that the memorandum at issue consists solely of opinions as to how to determine what is a permit violation and how to compile violations lists. They say it contains no factual content of any kind. They contend that "[d]ecisions as to how to compile this list, in turn, reveal the 'mental impressions, conclusions, opinions, [and] legal theories' (Rule 26(b)(3)) of plaintiffs' counsel concerning the litigation." Pl.Br. at 10.

In addition, plaintiffs argue that defendant has not demonstrated that it has a substantial need for the materials or that it cannot without undue hardship obtain the equivalent information by other means. *Id.* at 11. First, plaintiffs assert that the memorandum bears no relationship to Mr. O'Donnell's trial testimony. Mr. O'Donnell will testify only as to his preparation of certain exhibits relating to the application of the EPA and NJDEPE penalty policies. The memorandum does not discuss these policies. Mr. O'Donnell will not testify as to the defendant's permit viola-

---

**34.** *Grand Jury Empanelled February 14, 1978,* 603 F.2d 469, 474 (3d Cir.1979); *Wei v. Bodner,* 127 F.R.D. 91, 94 (D.N.J.1989) (citing *Brock v. Gerace,* 110 F.R.D. 58 (D.N.J.1986)).

tions, which is the subject of the memorandum.

Plaintiffs argue that if defendant needs information about its permit violations, it can obtain them from its own DMR's, laboratory reports and wastewater analysis sheets. *Id.* at 12. Plaintiffs also note that they have provided defendant with lists which set forth each of the violations alleged by plaintiffs. *Id.* They further state that if defendant needs information as to how Mr. O'Donnell compiled the lists of permit violations, it need only refer to his deposition testimony, in which he explained the procedures he followed in compiling the lists. *Id.*

Plaintiffs also contend that Judge Rosen's Order was premature. They argue that if this court decides the summary judgment motions before trial, the question of defendant's liability will probably be determined, leaving only the issue of damages to be resolved at trial. Obviously, in light of the court's determinations regarding summary judgment and the testimony of Mr. O'Donnell, above, the issue of discoverability of the Harrison Memorandum is ripe for decision.

Defendant points out, on the other hand, that plaintiffs voluntarily named Mr. O'Donnell as a trial witness. Mr. O'Donnell is Mr. Harrison's successor as paralegal for plaintiffs' counsel's law firm. The Harrison Memorandum is a general memo about how to make up a violations list, such as what is a reporting violating or a monitoring violation. O'Donnell Dep.Tr. at 28–30. Mr. O'Donnell reviewed this memo in order to prepare the list of violations in this case. *Id.* at 28. Mr. O'Donnell testified at length in his deposition. Defendant argues that "if plaintiffs' counsel voluntarily chooses to use their own employees as witnesses then any applicable privilege is waived." Letter of Joel Schneider to Judge Rosen (dated February 13, 1992).

Having reviewed these arguments, as well as the Harrison Memorandum which has been submitted *in camera*, I find that counsel have submitted arguments and documents to me that were not fully presented to Magistrate Judge Rosen,[35] and that developments in this case subsequent to Judge Rosen's Order have changed the background under which the claims of work product and waiver must be assessed.[36] When significant developments after the Magistrate Judge's determination have occurred, including factual developments and the exposition of legal arguments, a remand to the Magistrate Judge for further consideration is the proper course. *Canadian Imperial Bank of Commerce v. Boardwalk Regency Corp.,* 108 F.R.D. 737, 741 (D.N.J.1986). In *Canadian Imperial Bank,* Judge Cohen determined that factual developments occurring in the case and in a related enforcement action could arguably warrant an analysis and re-

**35.** Such submissions include a significantly more detailed Memorandum attaching 16 Exhibits, of which Ex. 1, 2, 3, 4 (in part), and 5 were not made available to the Magistrate. These new documents cast the Harrison Memorandum in a somewhat different light. For instance, Ex. 2 identifies the narrow scope of Mr. O'Donnell's proposed trial testimony as related only to the application of the NJDEPE penalty matrix and the gravity component of the EPA Civil Penalty Policy to defendant's permit violations (Letter of Ms. Lyons to Mr. Schneider, Oct. 8, 1991). Also, Ex. 3 is comprised of the proposed trial exhibits prepared by Mr. O'Donnell demonstrating the alleged application of the EPA and NJDEPE civil penalty policies to the alleged Hercules violations; these matrix charts do *not* appear to be the "violation lists" that the Harrison Memorandum was used to prepare, so that the relevance of the Harrison Memorandum to O'Donnell's trial testimony is questionable and must be explored further. Also Ex. 5 is a more complete transcript of O'Donnell's Deposition Testimony

(Dec. 16, 1991) at pp. 16–49, going into significantly greater detail about the preparation of violation lists in this case and others; this raises two issues that could not have been considered on the record provided to Magistrate Judge Rosen, namely (1) whether the O'Donnell testimony about his mental processes in formulating the violation lists amounts to a subject matter waiver of work product that would embrace the underlying procedures for doing so outlined in the Harrison Memorandum, and (2) whether, on the other hand, defendant has demonstrated a substantial need for the Harrison Memorandum in spite of (a) the rather detailed testimony about how the violation lists were made and (b) the fact that O'Donnell will not be offering any testimony at trial about preparation of the violation lists.

**36.** Such developments include both the narrowing of the types of violations which remain in dispute at trial, and the narrow definition of scope of Mr. O'Donnell's permitted trial testimony, as determined elsewhere in this Opinion.

sult different from that which the undersigned, then a Magistrate, had reached in determining the discoverability of confidential information. Judge Cohen pointed out, as I do now, that by his remand "we do not mean to suggest an opinion regarding the ultimate outcome of the discovery motion, but only intend to provide full and prompt opportunity for the Magistrate to consider any new evidence present." *Id.* at 741. Also, this remand will give Judge Rosen the opportunity to develop a more complete expression of his adjudication.[37]

It should be emphasized that this remand gives an opportunity for consideration of plaintiffs' arguments that were alluded to, but not developed, in the informal motion practice.[38]

For these reasons, plaintiffs' appeal from the Order of March 11, 1992, will be dismissed and the matter remanded to the Magistrate Judge for further consideration in accordance with this opinion.

## CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part both parties' motions for summary judgment; deny plaintiffs' motion for a permanent injunction without prejudice to an application based upon future violations; deny defendant's motion in limine to bar evidence regarding its Kenvil Facility; deny defendant's motion in limine to bar the testimony of Michael O'Donnell, and will permit Mr. O'Donnell to testify as to his preparation of certain exhibits discussed herein which plaintiffs seek to introduce at trial; and will dismiss plaintiffs' appeal of Magistrate Judge Rosen's March 11, 1992

---

**37.** The Order eventually entered for the March 11, 1992 decision on April 7, 1992 expresses no reasons.

**38.** For example, defense counsel initially argued that Mr. O'Donnell, at his deposition, "testified that he relied upon a memorandum prepared by his predecessor [the Harrison Memorandum] to determine how to compute the penalties," and he attached pp. 27–29 of the deposition transcript in support of this argument. Letter of Joel Schneider, Jan. 29, 1992 at 1. The informal opposition letter from plaintiff's counsel (Letter of Elisabeth Lyons, Feb. 12, 1992 at 3) did not directly refute Mr. Schneider's characterization of the purpose of Mr. O'Donnell's use of the

Order and remand the matter to Judge Rosen for further consideration in accordance with this Opinion.

An appropriate Order will be entered.

Harrison Memorandum. On the other hand, Ms. Lyons' later letter of February 21, 1992, finally drew a distinction between the preparation of violation lists (in which Mr. O'Donnell used the general internal guidelines in the Harrison Memorandum) from the preparation of the matrix charts for calculating fines in accordance with the NJDEPE penalty matrix and the gravity component of the EPA civil penalty policy (for which the Harrison Memorandum plays no role). Although this argument, and its support, did not fully emerge in the record below, it also is not the sort of argument being raised before the District Judge for the first time on appeal.